[S. F. No. 2377. In Bank.— April 3, 1901.]

EUGENE N. FRITZ, Appellant, v. CITY AND COUNTY OF SAN FRANCISCO et al., Respondents.

PARK AND BOULEVARD ACT — ELECTION FOR BONDS — VOTE REQUIRED — CONSTRUCTION OF STATUTE — TYPOGRAPHICAL ERROR. — The Park and Boulevard Act (Stats. 1889, p. 361), providing for an election for the issuance of bonds thereunder, and that, "if at such an election two thirds of the qualified electors voting an assent to the issuance of the bonds," then the municipality may by ordinance provide for their issuance, is not to be construed as requiring the assent of two thirds of all the voters of the municipality, but only of two thirds of the electors voting. The word "an" is to be rejected as a typographical error; and the provision is to be construed as if it read, "If at such an election two thirds of the qualified electors voting, assent to the issuance of the bonds, then," etc.

ID. — ACT SUPERSEDED BY CHARTER OF SAN FRANCISCO — PREVIOUS ELECTION — ISSUANCE OF BONDS — INJUNCTION. — The Park and Boulevard Act is inconsistent with the provisions of the charter of the city and county of San Francisco, which went into effect January 8, 1900, and was then superseded thereby, as applicable to that city and county. Bonds voted thereunder, at a previous election, cannot be lawfully issued after the charter took effect, and the issuance thereof may be enjoined at suit of a taxpayer.

ID. — SCHEME PROVIDED BY CHARTER — NOTICE OF ELECTION. — The San Francisco charter provides a complete scheme for the acquisition of permanent municipal improvements, which is materially different from that provided in the Park and Boulevard Act, and no bonds can be issued under the charter for park and boulevard purposes, unless the notice of election accords with the provisions of the charter.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. J. M. Seawell, Judge.

The facts are stated in the opinion of the court.

Charles E. Naylor, and Arthur H. Barendt, for Appellant.

W. B. Treadwell, and Theodore H. Hittell, *amici curiæ*, also for Appellant.

Franklin K. Lane, City Attorney, George W. Lane, and Garret W. McEnerney, for Respondents.

John Chetwood, Joseph Rothschild, Rosenthal & Wise, Freeman & Bates, and D. C. Murphy, *amici curiæ*, representing other Taxpayers, also for Respondents.

GAROUTTE, J.—This is an appeal from a judgment of the superior court in and for the city and county of San Francisco sustaining the demurrer to a complaint filed by a taxpayer in a proceeding to enjoin the board of supervisors and the mayor of said city and county from taking any further action in pursuance of certain proceedings previously inaugurated, and having for their object the issuance of bonds of said city and county, and the purchase of lands for park purposes from the proceeds thereof. The proceedings leading up to the proposed issuance of these bonds are assailed at many places, but the court finds it necessary to review only the more important propositions of law involved.

The Park and Boulevard Act (Stats. 1889, p. 361), under which the election was held submitting the question of the issuance of these bonds to the electors of the city and county of San Francisco, provides (sec. 6), "If at such an election two thirds of the qualified electors voting an assent to the issuance of the bonds, then the 'city and county' or 'city or town' having held such election, may, by ordinance, or in such manner as other municipal legislative acts are enacted under its charter, provide," etc. It is now claimed that the proper construction of this section demands that two thirds of all the qualified electors of the city and county of San Francisco must vote in favor of the issuance of the bonds, or the proposition for their issuance is defeated. The statute cannot bear this construction. As it appears upon the page, it is apparent by a casual inspection that a misprint has occurred. For, as it stands, literally it is meaningless. But if we eliminate the word "an," the insertion of which is clearly a typographical error, then the section becomes grammatically correct, and full of meaning, for it would read: "If at such an election two thirds of the qualified electors voting, assent to the issuance of the bonds, then," etc. Standing upon the page in this form, it means exactly what it says, and says only one thing; namely, if two thirds of the qualified electors voting, assent, etc. If any authority were needed to support this construction of the statute, it may be found in *Howland* v. *Board of Supervisors*, 109 Cal. 152. But the language of the section as it should

appear upon the page is so clear and explicit, that its meaning in no degree is doubtful.

The proceedings taken by the city, leading up to the election here involved, were had under a general law. (Stats. 1889, p. 361.) This election was held in the latter part of the month of December, 1899, and the present charter went into effect January 8, 1900. The question is now presented, What effect did the new charter have upon the general law under which these proceedings were inaugurated and conducted? In speaking of charters similar to that of this city and county, section 8, article XI, of the constitution declares that it "shall become the organic law thereof, and supersede any existing charter, and all amendments thereof, and all laws inconsistent with such charter." The second question is at once presented, Is the general law which may be termed the Park and Boulevard Act inconsistent with the provisions of the charter? If it is, then that act was superseded by the charter at the moment the charter went into force and effect, and is no longer applicable to this city and county.

Condensing the matter into a nutshell, it may be said that the Park and Boulevard Act provided a complete scheme for the acquisition of lands for park and boulevard purposes by the issuance of bonds, the proceeds thereof to be used for that purpose. Now, do we find any complete scheme laid down in the provisions of the charter to accomplish the same results? The court is entirely satisfied that such a scheme is there found. Section 29 of article XVI of that instrument provides: "When the supervisors shall determine that the public interest requires the construction or acquisition of any permanent municipal building or improvement, the cost of which, in addition to the other expenses of the city and county, will exceed the income and revenue provided for the city and county for any one year, they must, by ordinance passed by the affirmative vote of not less than fourteen members of the board, submit a proposition to incur a bonded indebtedness for such purposes to the electors of the city and county, at a special election to be held for that purpose only. All the provisions of this charter providing for the acquisition of public utilities, so far as the same are applicable, shall apply to the manner of submitting such proposition to the electors, to the limitations of said bonded indebtedness, to the issuance and character of the same, and to the time when and the kind of money in which said bonded

indebtedness shall be payable." Measured by the notice of election given in these proceedings, it appears that this bonded indebtedness was to be created "for the acquisition, by purchase, or by condemnation proceedings according to law, of the following lands for public park purposes": 1. Thirteen blocks, being for an extension of the Panhandle of Golden Gate Park; 2. Eight blocks for a connection between said Golden Gate Park and the Presidio Military Reservation; 3. Two blocks for a public park in that part of the city and county known as the Mission.

Chapter II of article II of the charter defines the powers of the board of supervisors, and subdivision 12 thereof declares, "To purchase or acquire by condemnation such property as may be needed for public use." By this provision of the law the board of supervisors of the city and county of San Francisco is vested with power to purchase land for a public park. The question then remains, Does this proposed acquisition of lands for public park purposes come within the provisions of the aforesaid charter section, which allow the supervisors to submit to the electors the question of the creation of a bonded indebtedness for the purpose of "acquisition of any permanent municipal building or improvement"? The court is satisfied that the acquisition of these lands for park purposes, by the city, would be an acquisition by the city and county of a permanent municipal improvement within the spirit and intent of the charter. An extension of the Panhandle to Van Ness Avenue would be a permanent municipal improvement of the highest character; likewise would be the acquisition of eight blocks of land for the purpose of connecting the park with the Presidio Military Reservation; and likewise the acquisition of two blocks of land in the Mission district for public park purposes. If Golden Gate Park may be designated as a permanent municipal improvement of the city and county of San Francisco, then the extension of that park by way of boulevards to the military reservation and to Van Ness Avenue, is an improvement of a like character. It is thus apparent that the acquisition of this property by the city and county is authorized by the section of the charter quoted, wherein the power to acquire permanent municipal improvements is granted.

The scheme for the acquisition of this property, as set out in the provisions of the charter, is also perfect and complete.

Section 6, previously quoted, declares that "all the provisions of this charter providing for the acquisition of *public utilities*, so far as the same are applicable, shall apply to the manner of submitting such propositions to the electors, to the limitations of said bonded indebtedness, to the issuance and character of the same, and to the time when and the kind of money in which said bonded indebtedness shall be payable." Upon turning to article XII of the charter, we find there laid down a comprehensive scheme, perfect and full in all its details, providing for the acquisition of public utilities by the creation of a bonded indebtedness. As we have seen, the provisions of that article are made applicable to the provisions of said section 6, and thus we find within the provisions of the charter a complete and perfect scheme for the acquisition of permanent municipal improvements of the character now before us. The respective schemes of the charter and the Park and Boulevard Act for the creation of a bonded indebtedness to acquire improvements are different in many respects, and therefore the Park and Boulevard Act is inconsistent with the charter. The result declared by the constitution, where such inconsistency exists, must follow; namely, the Park and Boulevard Act is superseded by the charter. That act being superseded by the charter, it is gone from the case. It went *instanter* the moment the charter took effect. It is no more a law applicable to the city and county of San Francisco, and its provisions can no longer be invoked to support this proceeding.

By reason of the foregoing conditions the remaining questions present themselves: May these bonds now be issued under the provisions of the charter? May the charter take up the work where the Park and Boulevard Act left it, and continue it to the end? Our answers to these interrogatories must be in the negative. It cannot be done; for the charter only contemplates the issuance of bonds, based upon the procedure laid down by the charter. As we have said, the scheme laid down is complete in itself, and it must be followed as a whole, or the attempt to create a bonded indebtedness will inevitably come to nothing. The bonds must be issued after the procedure marked out by the charter has been followed, or they cannot be issued at all.

By carrying out to greater detail the discussion of the proposition of law which has just received our consideration, the soundness of the conclusion declared is even more apparent.

In the creation of a bonded indebtedness under the charter, section 9, article XII, of that instrument thus declares what shall be specified in the notice of election: "Such notice shall specify the purpose for which the indebtedness is to be incurred, the number and character of the bonds to be issued, the rate of interest to be paid, and the amount of the tax levy to be made for the payment thereof." It must be conceded that no bond issue can be had under the charter, unless the notice of election shall specify the matters demanded in said section 9. By this provision of the charter, the electors, prior to the election, must have notice of the facts there set forth, and if they do not have such notice, no election held under any other notice can give the city and county authority to issue bonds. The notice of election here involved did not fill the measure furnished by the aforesaid section. Even if it be conceded that the *number* of bonds may be deduced by mathematical computation from the notice of election given, still the *character* of the bonds is not mentioned. Section 11 of the same article declares that those bonds shall be of the character known as serials. No other kind of bonds can be issued under the charter. Yet this notice of election says nothing about serials; or, possibly, it may be said that the notice of election, wherein it is provided that the bonds shall mature and become due and payable in twenty years from the date thereof, is, in effect, a notice to the electors that they shall not be serial bonds. Does the city and county now propose to issue serial bonds,—that is, bonds, a certain number of which are payable each year? or does it propose to issue bonds, all payable at the end of twenty years? But it cannot issue serial bonds, for the notice of election said nothing about serial bonds. Neither can it issue bonds payable in twenty years, for bonds of that character cannot be issued under the charter. It seems to follow that bonds cannot be issued at all. Again, it was demanded by said section 9 that the notice of election shall specify "the amount of the tax levy to be made for the payment thereof." In view of the fact that the bonds must be serial bonds, it is perfectly plain what this provision of the notice means. Yet there is nothing in the notice of election given in this case, even looking toward the carrying out of this demand of the law.

We will not pursue further this investigation. The scheme provided by the charter for the creation of a bonded indebted-

ness being materially different from the scheme provided by the Park and Boulevard Act for the creation of a bonded indebtedness, a proceeding inaugurated under the one scheme cannot be continued under the other. When the first scheme failed, the proceeding failed. When the law was superseded, that moment the proceeding fell. Again, it is plain that the notice to electors actually given for this election was not the notice demanded by the charter, and no issue of bonds under the provisions of the charter can be valid which has not the support of an election held under a notice specifying, in substance, all matters designated in section 9 of article XII of the charter. The notice relied on in this case did not comply with the provisions of that section, and therefore no issue of bonds by the city and county of San Francisco, based upon an election held under some other notice, will be valid.

For the foregoing reasons the judgment is reversed and the cause remanded.

Henshaw, J., McFarland, J., Van Dyke, J., and Harrison, J., concurred.

TEMPLE, J., concurring.—I concur in the conclusion reached in the principal opinion, but upon slightly different grounds. As I understand the opinion, it is determined that the Park and Boulevard Act was abrogated by the adoption of the charter, because the charter itself contains a provision authorizing the supervisors to do the same thing authorized by that act. In other words, the purchase of lands for parks and boulevards, and the issuance of bonds, is a "municipal affair," because it is authorized by the charter itself. To sustain this proposition, reliance is placed entirely upon section 29 of article XVI of the charter, which is an article entitled "Miscellaneous," and is made up of explanatory and supplemental provisions. Section 29, as I understand it, merely provides for a possible contingency,— to wit, when, in pursuing its lawful authority, the board proposes to acquire permanent municipal improvements, it finds that the cost will exceed the annual revenue, it may issue bonds. Whether it may acquire the particular improvement or expend municipal funds for that purpose is not determined at all by that section. To answer this question, which was the main matter discussed by counsel, other charter provisions must be considered. Surely, it was never

doubted that if these lands could be acquired under the charter, bonds could be issued therefor under section 29. As I understand the controversy, the Park and Boulevard Act was relied upon because the city authorities were of the opinion that the municipal charter, of itself, did not authorize the purchase of the lands for that purpose. And since the charter specifies a great many public municipal improvements which the supervisors and the board of public works may acquire, and does not specify parks and boulevards, there is some ground for such belief.

Subdivision 12, chapter II, article II, certainly does not, of itself, unaided by other provisions, authorize the board of supervisors to purchase lands by condemnation for a public park. Surely, it was not intended to confer power to purchase by condemnation, when the board could not purchase without condemnation, if the owner would sell for a fair price. It does not authorize the board to purchase lands for a purpose for which they could not have purchased without this authority. It authorizes the proceeding to condemn only when the owners are unwilling to sell, or demand an exorbitant price. The public uses referred to are those defined in other sections. Can it be contended that it was intended to throw the door wide open, and authorize such purchase for any use which might be deemed public? To acquire lands for a race-track or a beer-hall, or perhaps for a hotel, might be deemed a public use. The reference emphasizes my proposition that the doctrine of this opinion is, that the only limitation on the power of the board is, that, in the opinion of the board, the public interests require the acquisition of the improvement. The professed policy of the advocates of the new charter was, not to leave the gates ajar.

From my point of view, it is not necessary to determine whether the municipal charter authorizes the purchase of lands for park and boulevard purposes. If it does authorize such purchase, plainly, as determined by Mr. Justice Garoutte, the procedure there prescribed has not been followed. If such power is not found in the charter, it is my opinion no general law can add that provision to the charter. I do not comprehend how it can be said that a statute which confers upon a city council additional powers over affairs of the city, — powers which have always been deemed municipal, and only concern the city as such, — which authorizes the city to incur an

indebtedness of four millions of dollars, and which makes necessary a large annual expenditure by the city forever thereafter, is not a municipal affair. If a general law having such effect is not prohibited by section 6, article XI, of our constitution, then language has lost its force, and nothing has been accomplished by this long struggle and many amendments to the constitution for the purpose of preventing legislative interference with municipal affairs.