[L. A. No. 5000.   In Bank.—June 26, 1917.]

## CITY OF LONG BEACH, Petitioner, v. W. T. LISENBY, Mayor, etc., et al., Respondents; L. M. WOOD et al., Interveners.

MUNICIPAL CORPORATIONS—POWERS.—A municipal corporation possesses and can exercise only such powers as are granted in express words, those necessarily or fairly implied in or incidental to the powers expressly granted, and those essential to the declared objects and purposes of the corporation—not simply convenient but indispensable.

ID.—CITY OF LONG BEACH—POWER TO IMPROVE HARBOR—CONSTRUCTION OF CHARTER.—The city of Long Beach, under subdivision 11, section 1, article II, of its charter, giving it the power to build, own, alter, and improve the waterfront of the city, and to build and improve wharves, has not the authority to improve the harbor by dredging, deepening, and improving the channels and slips, since the word "waterfront" does not include the water comprising the harbor and the underlying land, but means the land or land and buildings fronting on the body of water.

ID.—POWER TO IMPROVE HARBOR UNDER STATUTES.—The city of Long Beach has power, however, under other provisions of its charter and the acts of the legislature of 1911, granting to the city all state rights in tide and submerged lands within the boundaries of the city, with the right to use such lands for harbor construction, to improve its harbor and to incur a bonded indebtedness therefor.

ID.—PUBLIC TRUST IN TIDE-LANDS—VALIDITY OF.—A public trust in tide and submerged lands situated in a city for purposes of establishing a harbor, improving the same and managing such harbor to accommodate commerce and navigation, is not forbidden by any general law.

ID.—TIDE-LANDS—OWNERSHIP AND CONTROL BY STATE.—The title and control to tide-lands and adjacent submerged lands of navigable waters is vested in the state impressed with a public use for navigation and commerce purposes, and the state as trustee may manage and control such use and improve such lands and waters in furtherance of such use.

ID.—MANAGEMENT AND CONTROL OF TIDE-LANDS—GRANT TO MUNICIPALITY.—The state may, for navigation and commerce purposes, grant control and management of tide and submerged lands to a local administrative agency, such as a city possessing the necessary powers.

ID.—ACCEPTANCE OF GRANT—POWER OF CITY OF LONG BEACH.—The city of Long Beach has power, under its charter providing that it shall have power to receive donations of property in the manner and for

the purposes and upon such trusts and conditions as are in accordance with law, to accept tide-land property granted to it by the state.

APPLICATION for a Writ of Mandate to compel the signing of municipal bonds.

The facts are stated in the opinion of the court.

Geo. L. Hoodenpyl, City Attorney, and Bordwell & Mathews, for Petitioner.

Denio & Hart, for Respondents.

Francis G. Burke, for Interveners.

SHAW, J.—This is a proceeding in mandate to compel the respondents to sign certain bonds of the city of Long Beach, amounting to three hundred thousand dollars, which have been prepared for issuance by the city in pursuance of a vote of the electors thereof at an election called for that purpose.

The bonded indebtedness in controversy was for the purpose of raising funds to pay the expense of improving the harbor of Long Beach "by dredging, deepening, and improving the channels and slips therein and the waterfront thereof," and by opening a channel to connect said harbor with the inner harbor of Los Angeles in the bay of San Pedro.

Long Beach was organized and incorporated as a city in 1897, and has been operating under a freeholders' charter since February 26, 1907. (Stats. 1907, p. 1178.) A revision of said charter was adopted in 1915. (Stats. 1915, p. 1656.) The city fronts on the outer bay of San Pedro and its boundaries extend three miles seaward from the shore. The question whether or not the city of Long Beach has power to make the improvement for which the bonds were voted as aforesaid is the only matter presented for determination.

"A municipal corporation possesses and can exercise the following powers and no others: 1. Those granted in express words; 2. Those necessarily or fairly implied in or incidental to the powers expressly granted; and, 3. Those essential to the declared objects and purposes of the corporation—not simply convenient, but indispensable. Any fair, reasonable doubt concerning the existence of the power is resolved by

the courts against the corporation, and the power is denied.'' (1 Dillon on Municipal Corporations, sec. 89.) This is the approved rule in this state. (*Von Schmidt* v. *Widber,* 105 Cal. 157, [38 Pac. 682] ; *Hyatt* v. *Williams,* 148 Cal. 586, [84 Pac. 41] ; *Oro Electric Corp.* v. *Railroad Commission,* 169 Cal. 466, 477, [147 Pac. 118].) "If an express power to accomplish some result has been conferred, it will carry with it the authority to do such subsidiary acts as are incidental and necessary to the exercise of that power.'' (*Von Schmidt* v. *Widber,* 105 Cal. 157, [38 Pac. 682].) It is claimed that the power contended for has been granted to the city by its charter and also by statutes of the state.

One provision of the charter relied on as conferring the power in question is subdivision 11, section 1, article II, where the city is given the power to ''build, own, alter,'' and ''improve, . . . the waterfront of said city,'' and to build and improve wharves, piers, bulkheads, retaining walls, and chutes. (Stats. 1915, p. 1659.) If the meaning of the word ''waterfront'' includes the water comprising the harbor and the underlying land, this provision would confer the power. But we are referred to no definition which gives the word so broad a meaning. The other words above quoted indicate that it was not used in this sense, for while a harbor might be improved by dredging and deepening it, it is not, according to the common usage of our language, appropriate to speak of building a harbor. The word is said by Webster to mean ''land, or land with buildings, fronting or abutting on a body of water.'' This is its ordinary meaning. We are aware of no authority holding it to include the body of water also. This provision, by the rule above stated, cannot be said to give power to improve the body of water or harbor, upon which the ''waterfront'' abuts, by dredging, deepening, enlarging, or extending it.

We think, however, that the provisions of certain statutes, taken in connection with other provisions of the charter, do confer that power.

On May 1, 1911, two laws were enacted by the legislature. The first one grants to the city of Long Beach ''all the right, title and interest of the state of California, held by said state by virtue of its sovereignty, in and to all the tide-lands and submerged lands, whether filled or unfilled, within the present boundaries of said city, and situated below the line of mean

high tide of the Pacific Ocean, or of any harbor, estuary, bay or inlet within said boundaries, to be forever held by said city, and by its successors, in trust for the uses and purposes, and upon the express conditions following, to wit:

"(a) That said lands shall be used by said city and by its successors, solely for the establishment, improvement and conduct of a harbor, and for the construction, maintenance and operation thereon of wharves, docks, piers, slips, quays, and other utilities, structures and appliances necessary or convenient for the promotion and accommodation of commerce and navigation. . . .

"(b) That said harbor shall be improved by said city without expense to the state, and shall always remain a public harbor for all purposes of commerce and navigation." (Stats. 1911, p. 1304.)

Section 1 of the other law provides that "Any city or city and county whose corporate limits include or front upon any harbor, bay or estuary, or other navigable water whether the tide lands or waterfront thereof is owned or controlled by it or by the state, either in whole or in part, is hereby authorized to incur an indebtedness for the improvement, repair and maintenance of its harbor, . . . and such city, or city and county for the purpose of providing a fund or funds for the payment of such indebtedness, is hereby authorized to levy and collect taxes therefor or to issue and sell its bonds therefor." Section 2 declares that all provisions of law or of the charter of such city relating to the issuance and sale of bonds of such city and to the mode of conducting elections authorizing the same, shall apply to the issue and sale of the bonds authorized by the act and to the conduct of the elections therefor. (Stats. 1911, p. 1462.)

The charter then in force contained the following clauses:

"The said city . . . shall have the power: . . .

"4th. To purchase, receive, have, take, hold, lease, use and enjoy property of every kind and description, both within and without the limits of said city, and control and dispose of the same for the general benefit.

"5th. To receive bequests, devises and donations of property, both within and without the corporate limits of the city of Long Beach, in the manner and for the purposes, and upon such trusts and conditions as are now or may hereafter be in accordance with the general law. . . .

"28th. To exercise all municipal and police powers necessary to the complete and efficient management and control of the municipal property, . . . whether such powers are herein expressly enumerated or not, except such powers as are forbidden or controlled by general law." (Art. I, sec. 3, subds. 4, 5, 28; Stats. 1907, pp. 1182, 1185.)

"In all matters pertaining to municipal affairs, concerning which special provision is not made in this charter, the general laws of the state in force at the time are hereby declared to be, and shall be, a part of this chapter so far as the same are or may be applicable to the class of cities to which this municipality may belong." (Art. XV, "Miscellaneous Provisions," sec. 9; Stats. 1907, pp. 1234, 1235.) The word "chapter" is obviously a misprint for "charter," but the effect is the same, for the chapter is a part of the charter. All of these provisions were also incorporated in the charter of 1915. (Art. II, sec. 1, subds. 4, 5, and 28; Art. XXV, sec. 6; Stats. 1915, pp. 1658, 1659, 1661, 1709.)

A public trust in tide and submerged lands situated in a city for the purpose of establishing thereon a harbor, improving the same, and of managing such harbor when so established, for the promotion and accommodation of commerce and navigation, is a trust not forbidden by any general law, but is in accordance therewith. The title to the tide-lands, the adjacent submerged lands and the control of the navigable waters within the limits of the state, are vested in the state impressed with a public use for purposes of navigation and commerce. The state, as trustee, may manage and control such use and may improve such lands and waters in furtherance of the use. (*People* v. *California Fish Co.*, 166 Cal. 576, [138 Pac. 79].) It may, for that purpose, commit the execution of the trust in any specified territory to a local administrative agency, such as an incorporated city possessing the necessary powers. A trust to carry on a commercial enterprise unaffected by any public use would probably be void under the principles declared in *Low* v. *Marysville*, 5 Cal. 214, because the city could not be invested with power to administer it. But in this state it is now well settled that a city can be given power to carry on within its limits a public utility, or to improve and control a public harbor within its limits for the promotion of navigation and commerce. Under subdivision 5, aforesaid, the city of Long Beach had power to

accept the property granted to it by the state as aforesaid, upon any lawful trust and conditions. The trust, in itself, was lawful. The city, therefore, had power to accept the property upon the trust and subject to the use declared. To make the conditions requiring it to perform the duties of the trust lawful, it was, of course, necessary that the city should have already possessed, or that it should be given, power to do the necessary things. It being lawful, under subdivision 5, for the city to receive the donation of this property, it thereupon became municipal property subject to the public use. Subdivision 28, aforesaid, gives the city the "powers necessary to the complete and efficient management and control" of municipal property. The language of these subdivisions is broad enough to include all property received by the city upon any trust, the execution of which may lawfully be committed to a city. The latter subdivision supplements the former, and, taken together, the two manifestly give the city the power to accept this property for the public use and manage and control it for the promotion of navigation and commerce. It does not so clearly appear that a gift of power to improve such harbor at the expense of the city is necessarily implied therefrom. It could be argued with greater force that such power is at least incidental to the power to manage and control the harbor. Apparently the legislature of 1911 was not certain on this point, and to remove the doubt it passed the second statute from which we have quoted above. The two statutes pertain to the same subject and are to be construed together. By the latter, any city which owned a harbor, as Long Beach then did, was expressly empowered to incur the indebtedness necessary for its improvement and to issue bonds in the manner provided by law and sell the same to obtain funds wherewith to pay the expenses of such improvement. A grant of the power to make the improvement for which such money was to be paid is at least fairly to be implied from the gift of power to raise the money for that purpose.

The defendants refer to the statement in *Hyatt* v. *Williams,* 148 Cal. 586, [84 Pac. 41], that the Bond Act of 1901 (Stats. 1901, p. 27), does not purport to give the cities of the state power to carry on public utilities, but merely confers power to issue the necessary bonds where, by other statutory or charter provisions, such power to carry on or construct a

public utility is given. They suggest that the act of 1911 is of no greater effect than the act of 1901 in this respect. The provisions of the two acts are dissimilar on this point. The act of 1901 prescribes the mode of procedure for bond elections, bond issues, bond sales, and the letting of contracts for the works to be erected with the funds so obtained. It does not purport to give power to incur debts for any specific works. It refers to the "powers of municipality," in the exercise of which it may become necessary to incur a debt, evidently meaning the powers derived from some source other than the act itself. Its opening sentence expressly declares that such debt may be incurred "as hereinafter provided," thus showing, as also does the entire context, that the purpose of the act is to fix a mode for the exercise of existing powers, rather than to confer new or additional powers. The act of 1911 does not prescribe a procedure, but refers to other laws on that subject. It directly "authorizes" cities whose corporate limits include any harbor owned or controlled by it to "incur an indebtedness for the improvement . . . of its harbor." The statement in *Hyatt* v. *Williams* would not fairly apply to the act of 1911.

It is suggested in the briefs of respondents that the matter of improving the harbor is a municipal affair, that the legislature cannot, by general laws, confer upon the city any powers respecting the same or interfere therewith at all, and that the city must find authority for so doing from the provisions of the charter alone. This objection seems to be sufficiently answered by the above-quoted section of the charter itself, which provides that in all matters pertaining to municipal affairs, where provision is not made in the charter, the general laws of the state in force at the time shall be a part of the charter. (Sec. 6, art. XXV, of Charter of 1915.) The argument admits that the charter makes no provision for the powers here involved, and that they pertain to municipal affairs. It would follow, necessarily, by force of this section, that the general laws would control and would have the effect to confer upon the city such powers as are included in the terms of such laws.

The additional argument is advanced that because of the fact that section 3, article I, of the charter of 1907, and section 1, article II, of the charter of 1915, covering the same subject, each set forth an elaborate enumeration of powers

given to the city, among them being the power to improve the "waterfront" of the city, there is, by force of the maxim, *expressio unius est exclusio alterius,* an implied prohibition of any power to improve the harbor itself. This, it is contended, would prevent the legislature from conferring power upon the city concerning any of its municipal affairs. It is assumed, for the purpose of this argument, that the improvement of such harbor is a municipal affair of Long Beach, within the term as used in section 6, article XI, of the Constitution, making the charter paramount over general laws in municipal affairs. We refer to section 6, article XI, as it was prior to the amendment of 1914 thereto. As we have seen, the power to improve the waterfront does not include the power to improve the harbor itself. The subject matter of the two powers is not the same. On the principle invoked, the enumeration of the powers given would be the equivalent of an affirmative clause prohibiting the exercise by the city of any power over municipal affairs, other than those enumerated, and excluding all municipal affairs not mentioned from the operation of general laws. Our decisions not only do not support this conclusion, but are, in effect, contrary thereto. By section 6, article XI, as first adopted, all provisions of a city charter were "subject to and controlled by general laws." (*Thomason* v. *Ashworth,* 73 Cal. 77, [14 Pac. 615].) By the amendment of 1896, the words "except in municipal affairs" were inserted. Referring to this amendment, Justice Harrison, in his concurring opinion in *Fragley* v. *Phelan,* 126 Cal. 395, [58 Pac. 928], said: "It is not within the constitutional powers of the legislature, by approving a freeholders' charter which fails to make provision upon subjects pertaining to municipal affairs, to exempt that city from being subject to legislative control in reference to those subjects, nor can the city secure exemption from such control by omitting to make such provision in its charter." This rule has been consistently followed ever since. (*Fritz* v. *San Francisco,* 132 Cal. 377, [64 Pac. 566]; *Law* v. *San Francisco,* 144 Cal. 391, [77 Pac. 1014]; *Coffey* v. *Superior Court,* 147 Cal. 531, 535, [82 Pac. 75]; *Fleming* v. *Hance,* 153 Cal. 165, [94 Pac. 620]; *Nicholl* v. *Koster,* 157 Cal. 421, [108 Pac. 302]; *Clouse* v. *San Diego,* 159 Cal. 434, [114 Pac. 573].) In each of the cities to which this rule has been applied the charter contained an enumeration of the powers thereby granted to that city, a list fully

as elaborate and complete as that in the Long Beach charter. But it was held that the general law prevailed with respect to subjects on which the charter did not speak. The maxim, *expressio unius*, etc., was not held to make such enumeration a denial of legislative power as to subjects not enumerated.

That this has been the general understanding is shown by the amendment of section 6 in 1914, providing that cities *thereafter* organized under a freeholders' charter "are hereby . . . empowered to make and enforce all laws and regulations in respect to municipal affairs, subject *only* to the restrictions and limitations provided in their several charters, and in respect to other matters they shall be subject to and controlled by general laws," but that a city theretofore organized under a charter could have such complete power and exemption from general laws only by an amendment to its charter so declaring. In the argument printed with the sample ballots for the election of 1914, upon this amendment, and mailed in advance to each voter, its advocates said that the object was to do away with the rule that such city was subject to general laws upon municipal affairs upon all subjects as to which its charter was silent, and that cities previously so organized would have to expressly amend their charters in order to come under the amended rule. Upon this argument the amendment was adopted by the voters. If an enumeration of powers granted had had the effect here contended for, the amendment would have been wholly unnecessary, for every freeholders' charter then in existence contained such an enumeration.

The new charter adopted for Long Beach in 1915 does not purport to bring it within the amendment of 1914. Instead, it expressly provides, as above stated, that where "special provision" as to a municipal affair is not made in the charter, the general laws apply.

We have, so far, assumed that where the matter of improving and controlling a public harbor comprising a part of the navigable waters of the state, but situated within the corporate limits of a city, has been delegated by the state to such city, it thereupon becomes a municipal affair within the meaning of that phrase as used in section 6, article XI, of the Constitution. We do not say that such a matter is a municipal affair. It may be that in its nature and origin it is primarily a matter of more general concern and a state affair, but we need not decide the point. The statement in section 6, article

XI, that "in respect to other matters they shall be subject to and controlled by general laws," plainly implies that such a public matter of general concern, not strictly municipal in its nature, may be committed by general laws to a city for its administration, in so far as such administration is confined to the territorial limits of that city. (*Fragley* v. *Phelan*, 126 Cal. 387, [58 Pac. 923].) This being the case, if the power to administer it exists, it is immaterial whether its source is the charter or the general law, and also immaterial whether its local administration is or is not a municipal affair. The election was called to authorize a bonded debt exclusively for the purpose of improving the harbor of Long Beach and to acquire the property necessary therefor. The question whether or not the channels and slips thereof, or some part thereof, were made by excavating upland, and consequently did not go to the city by the grant from the state of tidelands, cannot be litigated in this proceeding against the mayor and treasurer. If the city attempts to use the bond money for an unlawful or unauthorized purpose, this decision will not estop a taxpayer from raising the objection. (*Clark* v. *Los Angeles*, 160 Cal. 37, [116 Pac. 722].)

The conclusion is that the city has the power to improve the harbor and that the bonds are valid. The defendants, as officers of the city, should have signed the bonds as provided in the charter.

It is ordered that a writ of mandate issue commanding the defendants, W. T. Lisenby, as mayor of the city of Long Beach, and H. L. Pillsbury, as treasurer thereof, to sign the bonds described in the petition herein.

Sloss, J., Henshaw, J., Melvin, J., and Lawlor, J., concurred.