[L. A. No. 19873. In Bank. Dec. 30, 1947.]

CITY OF LONG BEACH, Petitioner, v. H. C. MORSE, as
City Treasurer, etc., Respondent.

Irving M. Smith, City Attorney, Nowland M. Reid, Assistant City Attorney, and Atlee S. Arnold, Deputy City Attorney, for Petitioner.

Roy J. Brown for Respondent.

TRAYNOR, J.—The city of Long Beach seeks a peremptory writ of mandamus to compel its treasurer to transfer certain revenue from the city's "Harbor Revenue Fund" to its "Public Improvement Fund." The revenue in question was derived from the production of oil and gas from the tidelands and submerged lands within the corporate limits of the city of Long Beach, claimed by the city under legislative grants from the State of California.

Before 1946, under the terms of the charter of the city of Long Beach, the revenue from the production of oil and gas from these lands was devoted to the improvement and maintenance of the harbor of the city of Long Beach and to the payment of principal and interest on bonds issued by the city for harbor purposes. (Long Beach City Charter, § 229x, Stats. 1937, p. 2939, as amended by Stats. 1943, p. 3097.) The city charter was amended in 1946 to provide for the transfer of 25 per cent of the fund in question to the "Public Improvement Fund." This amendment provides, however, that the "transfer shall be made only in the event that such moneys may be used and expended for the purposes hereinafter stated without violating the provisions of grants by which the City acquired title to all tide and submerged lands from the State of California, to wit, 1911 Statutes, page 1304, 1925 Statutes, page 235, and 1935 Statutes, page 794 . . . the moneys transferred to and placed in the 'Public Improvement Fund' shall be used exclusively for the payment of costs and expenses for construction, reconstruction, repair and maintenance of public improvements, . . . as shall have been provided for in the official budget of the City adopted by the City Council." (City Charter of Long Beach, § 229x, Stats. 2d Ex. Sess. 1946, Resolutions, ch. 6, pp. 366, 367.)

Respondent refused to make the transfer on the ground that it would be a violation of the charter provision for him to do so, because the revenue transferred to the "Public Improvement Fund" would be used for general municipal improvements unconnected with the purposes and uses provided

in the grants of the tidelands and submerged lands to the city. The city of Long Beach concedes that if the transfer is made, the money would be used for general municipal improvements not limited to the purposes specified in the legislative grants under which the city claims title to the lands. It is contended, however, that these grants restrict, not the use of any revenue derived from the lands, but only the physical uses to which the lands may be put. The issue in this case, therefore, is whether the use of money derived from the development of oil and gas on these lands for general municipal improvements would violate the terms of the grants under which the city of Long Beach claims title.

■ In 1911, the State of California transferred whatever title it may have had to the tidelands and submerged lands within the boundaries of the city of Long Beach* to that city in trust for certain uses and purposes connected with the development of Long Beach Harbor. (Stats. 1911, p. 1304.) The terms of the original grant were amended by the Legislature in 1925 (Stats. 1925, p. 235) and in 1935 (Stats. 1935, p. 793; 2 Deering's Gen. Laws, 1944, Act 4401.) The present provisions of the trust are as follows:

"There is hereby granted to the city of Long Beach, a municipal corporation of the State of California, and to its successors, all of the right, title and interest of the State of California, held by said State by virtue of its sovereignty, in and to all of the tide lands and submerged lands, whether filled or unfilled, bordering upon, under and situated below the mean high tide line of the Pacific Ocean, or of any harbor, estuary, bay or inlet, which are within the corporate limits of said city, to be forever held by said city, and by its successors, *in trust for the uses and purposes and upon the express conditions following, to wit:*

"(a) *That none of said lands shall be used or devoted to any purposes other than* public park, parkway, highway, playground, the establishment, improvement and conduct of a harbor and the construction, maintenance and operation thereon of wharves, docks, piers, slips, quays and other utilities, structures and appliances necessary or convenient for the promotion and accommodation of commerce and naviga-

---

*The United States is not a party to this proceeding and the extent to which the State of California could validly grant to the City of Long Beach any right in the lands in question under the decision of the United States Supreme Court in *United States* v. *California,* 332 U.S. 19 [67 S.Ct. 1658, 1664, 91 L.Ed. 1889], is not in issue.

tion; and said city, or its successors, shall not, at any time, grant, convey, give or alien said lands, or any part thereof, to any individual, firm or corporation for any purpose whatsoever; provided, however, that nothing herein contained shall be so construed as to prevent the granting or use of easements, franchises or leases for limited periods, or rights of way in, under, over or across said tidelands or submerged lands for power, telephone, telegraph or cable lines or landings, sewage disposal conduits, wharves and other public uses and purposes consistent with the trust upon which said lands are held, or the leasing or use of such tidelands or submerged lands for limited periods for the construction, maintenance, and operation of nonprofit benevolent and charitable institutions organized and conducted for the promotion of the moral and social welfare of seamen, naval officers and enlisted men, and other persons engaged in and about the harbor and commerce, fishery, and navigation.'' (Italics added.)

(b)   That the lands shall always be devoted to the conduct of a public harbor, without expense to the state.

(c)   That there shall be no discrimination in connection with the operation of the harbor.

(d)   The right to fish in the harbor is ''expressly reserved to the people of the State of California.''

This statute clearly provides that the state's interest in the lands is transferred in trust for certain uses and purposes. The city is a trustee and as such ''assumes the same burdens and is subject to the same regulations that appertain to other trustees of such trusts.'' (3 McQuillin, Municipal Corporations, 2d ed., § 1230, referring to charitable trusts.) The city of Long Beach contends that the proceeds from the production of oil and gas is merely income from the land and as such is not covered by any provisions of the trust, on the ground that the trust expressly applies only to the physical uses of the land. Whether the fund should be regarded as part of the corpus of the trust or merely as a part of the rents and profits of the land, the city as trustee has no right to devote the proceeds to general municipal improvements unconnected with the trust purposes. ▪ If the proceeds from the sale of oil and gas are regarded as corpus (see Rest. Trusts, § 238; Bogert, Trusts and Trustees, §§ 789, 828), they must be used for the purposes set forth in the legislative grants in trust, for the city, as trustee, clearly has no

authority to appropriate the corpus to its own uses contrary to the terms of the trust. If the proceeds are regarded as income from trust property, the trustee, in the absence of a legislative provision to the contrary, has no more right to them than it has to the corpus. (Civ. Code, § 2229; *Provident Land Corp.* v. *Zumwalt,* 12 Cal.2d 365, 375 [85 P.2d 116]; *Lamb* v. *Lamb,* 171 Cal. 577, 580-582 [153 P. 913]; *Purdy* v. *Johnson,* 174 Cal. 521, 529 [163 P. 893]; see *Methodist Benev. Assn.* v. *Bank of Sweet Spring,* 227 Mo.App. 566, 573 [54 S.W.2d 474, 478].)

Thus, in *Provident Land Corp.* v. *Zumwalt, supra,* this court held that an irrigation district acquired certain land in trust for the purposes of the California Irrigation District Act (Stats. 1897, p. 263, § 29) and that the rents and profits from such property were likewise subject to the trust. The act provided that such property was held "in trust for and is hereby dedicated and set apart to the uses and purposes set forth in this act." Although there was no express provision for the disposition of the rents from such land, the opinion stated that, "Once it is made clear that the lands are held in trust, it necessarily follows that their proceeds, whether by sale or lease, are likewise subject to the trust. It would be manifestly absurd to say that although the property is held in trust, none of the benefits of the trust accrue to the beneficiaries, and that none of the rents or profits of the trust property need be used in furtherance of the trust purposes. On this point, namely, that the land is trust property, held for the 'uses and purposes' of the act, and that the proceeds are stamped with the character of the property from which they flow, the statute read in the light of elementary principles, leaves no room for debate."

Similarly, since the "right, title and interest" of the State of California in the lands involved in the present case was granted to the city of Long Beach "in trust for the uses and purposes" set forth in the grants, it necessarily follows that the proceeds from the oil drilled from these lands can be used only in furtherance of the trust purpose. The city cites no authority contrary to this principle. It relies on the case of *City of Long Beach* v. *Marshall,* 11 Cal.2d 609, 620 [82 P.2d 362], in which this court held that the city had a right to drill oil from the lands so long as such drilling did not interfere with the trust purposes. The court there stated: "Nothing in the grant purports to reserve to the state or to

deny to the municipality the minerals or the right to extract them. . . . It is, of course, true that the operations must not be conducted in such manner as to impede the use of the harbor, but there is nothing before us to suggest that drilling will have any such effect.'' The city interprets this statement to mean that the only restriction on the city's right to oil is that the extraction thereof must not interfere with the harbor. In that case, however, this court was not concerned with the disposition of the proceeds from such operations, for at that time the proceeds were allocated entirely to ''[I]mprovement and maintenance of the harbor and servicing and redemption of outstanding harbor improvement bonds.'' (*Supra* at 612.) There was therefore no reason for the court to assume that the city would attempt to appropriate the proceeds for general municipal improvements, and it was unnecessary to consider a limitation implicit in the grant.

There is nothing in the case of *City of Long Beach* v. *Marshall* to indicate that the city owns these lands clear of any trust. The court held that the city took title to the lands in fee, but it impliedly recognized, in recognizing the limitation on the right of the city to drill, that the title was held subject to the express trust imposed in the legislative acts of conveyance. Moreover, the court did not purport to overrule *City of Long Beach* v. *Lisenby*, 175 Cal. 575, 579 [166 P. 333], which held that the city acquired title to these lands in trust. That case is cited with approval in the Marshall case, *supra* at 619.

In the Marshall case, the court referred to the fact that the Legislature had approved the charter amendment under which the city was authorized to conduct drilling operations on this land.

It is notable that subsequent to that case, the Legislature has again referred to the fact that the lands in question were ''conveyed *in trust* to the City of Long Beach.'' (Stats. 1943, p. 2577.)

Legislative approval of the present charter amendment cannot be relied on as indicative of a legislative purpose to enlarge the grant or as a legislative construction of its former grants. The amendment was approved in a joint resolution of the Legislature as required by article XI section 8 of the California Constitution, but the resolution and the charter amendment expressly provide that ''said transfer shall be made only in the event that such moneys

may be used and expended for the purposes . . . stated without violating the provisions of grants by which the City acquired title to all tide and submerged lands from the State of California . . ." (Stats. 2d Ex. Sess. 1946, Resolutions ch. 6, pp. 366, 367.)

If a legislative interpretation of the meaning of this and similar grants is necessary, it may be found in section 6875 of the Public Resources Code with respect to agreements between the State Lands Commission and cities holding title to tidelands under such grants. This section provides that "If the Legislature has transferred to any city or county the administration of the trust, whether or not limited, under which tide or submerged lands are held by the State, the commission, . . . may enter into agreements upon behalf of the State to compensate any such city or county for the use of surface drilling and operating sites upon such lands from the royalty or revenue to be derived by the State from oil and gas taken from such lands by lessees of the State . . . All money paid to any city or county under this section shall be used by it solely in furtherance of the trust under which the administration of tide and submerged lands has been transferred to such city or county and for the purposes expressed in the act so transferring administration of such lands."

It is contended that even if the grant as amended in 1925 and 1935 does not authorize the use of revenue from the land for local municipal purposes, the original terms of the grant contain such authorization and the Legislature was without power to deprive the city of this right by subsequent legislation. By the terms of the original grant the city was granted the land in question for the following uses and purposes:

"That said lands shall be used by said city and by its successors, solely for the establishment, improvement and conduct of a harbor, and for the construction, maintenance and operation thereon of wharves, docks, piers, slips, quays, and other utilities, structures and appliances necessary or convenient for the promotion and accommodation of commerce and navigation, and said city . . . shall not, at any time, grant, convey, give or alien said lands, or any part thereof, to any individual, firm or corporation for any purpose whatsoever; *provided, that said city . . . may grant franchises thereon, for limited periods, for wharves and other public uses and purposes, and may lease said lands, or any*

*part thereof, for limited periods, for purposes consistent with
the trusts upon which said lands are held by the State of Cali-
fornia and with the requirements of commerce or navigation
at said harbor. . . .*" (Italics added, Stats. 1911 p. 1304.)

It is suggested that the italicized clause authorized the
city to enter into oil leases and to dispose of the proceeds
thereof for municipal purposes unconnected with the general
purposes of the trust. This clause was amended in 1925 and
1935 so that it now provides "that nothing herein contained
shall be so construed as to prevent the granting or use of
easements, franchises or leases for limited periods, or rights
of way in, under, over or across said tidelands or submerged
lands for power, telephone, telegraph or cable lines or land-
ings, sewage disposal conduits, wharves and *other public uses
and purposes* consistent with the trusts upon which said lands
are held. . . ." (Italics added.)

The 1925 and 1935 amendments have heretofore been re-
garded as enlargements rather than as restrictions on the
terms of the original grant. (See *City of Long Beach* v.
*Marshall, supra*, 11 Cal.2d at p. 618.) The only express
change in the lease provision that might be regarded as a
limitation not previously contained in the grant is the ex-
press requirement that the lease be for "public uses and
purposes consistent with the trusts upon which said lands
are held."

The original grant has been interpreted as providing for
a trust for public purposes and as not creating a "trust to
carry on a commercial enterprise unaffected by a public
use." (*City of Long Beach* v. *Lisenby, supra*, 175 Cal. at
579; see, also, *City of Oakland* v. *Williams*, 206 Cal. 315, 322-
328 [274 P. 328], construing an identical provision of a con-
temporary trust. [Stats. 1911, p. 1258].) By these amend-
ments the Legislature may have sought merely to clarify the
meaning of this clause of the grant. Even if it be assumed,
however, that the proviso in the original grant authorized
the city to enter into commercial leases and that this authori-
zation extended to oil and gas leases, it does not follow that
the city of Long Beach may use the proceeds from the produc-
tion of oil and gas from these lands for general municipal
purposes unconnected with the expressed purposes of the trust.

Under the terms of the original grant, the extent of the
right of the city to enter into any type of lease is clearly
limited by the "trusts upon which said lands are held by the

State of California." The State of California has claimed title to these lands in trust for all the people of the state and whatever right the state may have to enter into oil and gas leases with respect to the production of oil and gas from these lands is subject to this trust. (*Boone* v. *Kingsbury*, 206 Cal. 148, 187-188 [273 P. 797], relying on *Illinois Cent. R. R.* v. *Illinois*, 146 U.S. 387, 452 [13 S.Ct. 110, 36 L.Ed. 1018]; cf. *United States* v. *California*, 332 U.S. 19 [67 S.Ct. 1658, 1664, 91 L.Ed. 1889].) Since the lands were held by the state in trust for all the people, and the city holds the lands subject at least to the same trusts, it may not use the proceeds for the local purposes contemplated by the charter amendment.

The development of the harbor, on the other hand, is expressly authorized by the grants as a public purpose in the interest of all the people of the state. (See, *City of Oakland* v. *Williams, supra,* 206 Cal. at p. 328.)

It follows that the proceeds from the sale of oil and gas from the lands in question may not be used for any purposes other than those specified in the trust conveyances under which the city claims title to the lands. The Legislature specified purposes relating to the harbor that it deemed beneficial to the state as a whole and did not authorize the city of Long Beach to use the corpus or the income of the trust for strictly local improvements.

The alternative writ is discharged and the petition for a peremptory writ is denied.

Gibson, C. J., Shenk, J., and Carter, J., concurred.

EDMONDS, J.—I concur in the conclusion that the revenue which is here in controversy may not be used for general municipal purposes. But I again call attention to the impropriety of a "friendly suit" by which only the city and one of its officers litigate a question of great public interest. (*Paso Robles etc. Hospital Dist.* v. *Negley,* 29 Cal.2d 203 [173 P.2d 813]; *City of Whittier* v. *Dixon,* 24 Cal.2d 664, 668 [151 P.2d 5, 153 A.L.R. 956]; *City and County of San Francisco* v. *Boyd,* 22 Cal.2d 685, 707 [140 P.2d 666]; *City and County of San Francisco* v. *Linares,* 16 Cal.2d 441, 448 [106 P.2d 369].)

SCHAUER, J.—I dissent. Two questions are presented for decision: (1) Does the proposed use by the city of Long Beach of revenue from oil production on the tidelands granted it

by the state violate the "trusts upon which said lands are held by the State of California?" (2) Does such proposed use violate any other trust or condition imposed by the grant from the state?

The original grant from the state to the city of Long Beach (Stats. 1911, p. 1304) conveyed "all the right, title and interest of the State . . . in and to all the tide lands and submerged lands . . . within the present boundaries of said city, . . . to be forever held by said city, and by its successors, in trust for the uses and purposes, and upon the express conditions following, to wit:

"(a) That said lands shall be used by said city and by its successors, solely for the establishment, improvement and conduct of a harbor, and for the construction, maintenance and operation thereon of wharves . . . and other utilities, structures and appliances necessary or convenient for the promotion and accommodation of commerce and navigation, and said city . . . shall not . . . grant, convey, give or alien said lands . . . to any individual, firm or corporation for any purpose whatsoever; *provided,* that said city, or its successors, . . . *may lease said lands, or any part thereof, for limited periods, for purposes consistent with the trusts upon which said lands are held by the State of California* and with the requirements of commerce or navigation at said harbor; . . . Reserving, however, in the people of the State of California the absolute right to fish in the waters of said harbor, with the right of convenient access to said waters over said lands for said purpose." (Italics added.)

1. *The trusts upon which the involved lands are or were held by the State do not preclude the city of Long Beach from arranging for the extraction of oil from such lands or from devoting the revenues of such lands to general municipal purposes.*

It has already been decisively established in this state that the drilling for oil on state tidelands, pursuant to permit from the state, *is* a purpose "consistent with the trusts upon which said lands are held by the State of California and with the requirements of commerce or navigation," provided only that no substantial interference with navigation, fishing or commerce results. The specialized nature and limits of the trusts involved were extensively examined and explained in *Boone v. Kingsbury* (1928), 206 Cal. 148 [273 P. 797]. In considering the power of the state to permit drilling operations on

portions of its tidelands, this court declared (p. 186 of 206 Cal.), ''It may be said of the situation that the coast line at the point in question is an unnavigable portion of a vast body of navigable water, and the use to which the state proposes to devote the soil, from a practical point of view, would not be incompatible with, or in 'derogation of the government's trust to preserve needed navigable waters for the benefit of the people.' [Citation.] . . .

''No uncertainty can exist as to the rights of the state to absolutely alienate its tide and submerged lands when they are unfit for navigation, are useless as aids of commerce and possess no substantial value as fishing grounds. The policy of this state is and has always been to encourage its citizens to devote waste and unused lands to some useful purpose. The power of the state to absolutely alienate lands perpetually covered by water has been upheld by all courts of the nation, state and federal, where the land so covered was severed from the main body by harbor and other improvements in such manner as to leave the remaining waters of no substantial use to navigation or commerce. It is only in those cases where the reduction of the water area amounts to a substantial interference with navigation and commerce or the fisheries that the absolute power of alienation by the sovereign and its control and dominion over said lands can be questioned. . . .

'' [p. 187] The rule to be kept in mind and which is recognized by every case bearing on the subject . . . is that the state has the unquestionable right to alienate its tide and submerged lands subject to the 'trust in which they are held for the people of the state that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein free from the obstruction or interference of private parties.' . . .

'' [p. 189] The state cannot abdicate its trust over property in which the whole people are interested, like navigable waters and soils under them, so as to leave them entirely under the use and control of private parties, except in the case of parcels used in promoting the interest of the public therein, or when parcels can be disposed of without impairment of the public interest in what remains. . . .

''The trust in which tide and submerged lands are held does not prevent the state from reclaiming tide and submerged lands from the sea where it can be done without prejudice to the public right of navigation and applying them to other

purposes and uses. As said in *Ward* v. *Mulford,* 32 Cal. 365:

" 'There are large tracts of salt marsh lands, of which the land in suit is an example, which are covered and uncovered by the flow and ebb of the neap tides, and therefore belong to the state by virtue of her sovereignty, which are of no possible use for the purposes of navigation, but may be valuable for agricultural or other purposes if reclaimed from the tides. Such lands the state may undoubtedly grant in private ownership for the purposes of reclamation and use, for by such a course no right of the public to their use for the purposes of navigation would be prejudiced. On the contrary, the right of navigation, in many cases, might be subserved by such reclamation.' " The court further pointed out that (p. 184) "should said permittees [in drilling operations] offer any substantial interference *incompatible* with navigation, fishing or commerce, the state and federal government would have the unquestionable right to abate it." (Italics added.)

Among the definitions given by Webster for consistent is "compatible," and among those for compatible is "consistent." Since the means of producing the funds here in question is consistent with "the trusts upon which said lands are held by the State" (as expressly held in *City of Long Beach* v. *Marshall* (1938), 11 Cal.2d 609, 620 [82 P.2d 362]) then it follows that the use of the funds for any purpose other than such as would cause positive physical interference with such trusts is also consistent therewith. The opinion of Justice Traynor cites *City of Long Beach* v. *Lisenby* (1917), 175 Cal. 575, 579 [166 P. 333], as authority for the statement that "The original grant has been interpreted as providing for a trust for public purposes and as not creating a 'trust to carry on a commercial enterprise unaffected by a public use.' " The discussion in the Lisenby case is directed to the point that since a "trust" in tidelands is for a public purpose rather than a private commercial purpose, the city may accept and administer it. The case contains nothing contrary to my views here. Certainly the production of oil and gas from tidelands and the use of proceeds therefrom for general municipal purposes is "affected by a public use."

It should be noted that from a holding that the city must devote the proceeds from the oil and gas production solely to purposes of navigation and commerce or be held to be acting in violation of "the trusts upon which" the *state* holds the lands for the people it would also inescapably follow that the

state (and presumably the federal government) must likewise devote its entire income from tidelands oil and gas production as well as from other uses or dispositions which might be made of tidelands not needed for navigation, commerce, or fishing, to the same limited purposes or itself violate such trusts. Is a majority of this court prepared to so hold? In that case, any excess of oil and gas income over expenditures for navigation purposes will seemingly be required to be held unused in the respective governmental treasuries. It is unequivocally held in *City of Long Beach* v. *Marshall* (1938), *supra*, 11 Cal. 2d 609, 612, 620, and *Miller* v. *Stockburger* (1938), 12 Cal.2d 440, 444 [85 P.2d 132], that as between city and state the proceeds of oil production here involved belong to the city.

2. *The grant from the state to the city, reasonably construed, does not preclude the allocation which the city proposes to make of revenue from the conveyed lands.*

Firstly, in granting lands to the city ''in trust for the uses and purposes, and upon the express conditions'' that they be used solely for harbor and navigation purposes and reserving fishing rights to the people of the state, it seems apparent that the state employed the word ''trust'' in the same specialized sense which the word carries when the ''trusts'' upon which the state itself holds tidelands are considered; i.e., that navigation, commerce and fishing purposes are of paramount concern, but that other uses may be made of the lands if such paramount purposes remain substantially unimpaired. Therefore, cases having to do with the power and duties of trustees of privately owned property are not controlling here. Nor are the grounds for the decision in *Provident Land Corp.* v. *Zumwalt* (1938), 12 Cal.2d 365 [85 P.2d 116] present here. Both the nature of the trust upon which the lands there concerned were granted for irrigation purposes and the rights of the bondholder ''beneficiaries'' differ from those involved in this action. Under the terms of the grant here it appears that the city is limited only by the limitations applicable to the state in the use to be made of income from tidelands.

Secondly, the proviso that the city ''may lease said lands . . . for purposes consistent with the trusts upon which said lands are held by the State of California and with the requirements of commerce or navigation at said harbor'' certainly is a broad enough exception to the limitations otherwise imposed to authorize the leasing of the lands for oil extraction; surely the word ''lease'' imports a consideration to be paid to the lessor; and, equally surely, the omission of any limitation

upon application of the revenues to be received by the lessor leaves it free to devote such revenues to the best public use as it may determine from time to time. As seen above, nothing in "the trusts upon which said lands are held by the State of California" or in "the requirements of commerce or navigation at said harbor" precludes the leasing of the lands for oil development and operation so long as the fishing rights of the people and the harbor uses are not interfered with. The leasing of such lands for oil operations, under conditions protecting the harbor usages and "the absolute right [of the people] to fish in the waters of said harbor, with the right of convenient access to said waters over said lands for said purpose" (Stats. 1911, p. 1305) is entirely consistent "with the trusts upon which said lands are held by the State of California and with the requirements of commerce or navigation at said harbor." Consequently, oil production on the lands under lease with use of the proceeds thereof for general municipal purposes does not violate the terms of the grant from the state. It would seem that, except as limited by the city charter, even revenues from harbor operation could be devoted by the city to such purposes as it chooses. It must use the land solely for the purposes specified in the grant, subject to the exceptions provided therein, but there is no direction in the grant as to the source of revenue to be devoted to carrying out such purposes and no limitation upon the use of revenues derived from the lands. On the contrary the grant provides that "said harbor shall be improved by said city without expense to the state . . . and the State . . . shall have, at all times, the right to use, without charge" all facilities thereof. The subsequent amendments to the grant of 1911, whatever their purpose, certainly cannot have the effect of divesting rights conveyed by the original grant.

Furthermore, if any doubt might otherwise exist as to the right of the city to effect the interfund transfer of moneys in question, it seems to me that it is dispelled by the act of the state in consenting to the Long Beach City Charter amendment of 1946. (Stats. 2d Ex. Sess. 1946, ch. 6, p. 366.) Section 229x of the charter, as amended, provides: "In addition to all other powers with which the Board of Harbor Commissioners is now or may hereafter be invested, and notwithstanding anything in this Charter to the contrary, said Board shall have the power to drill for, develop, extract . . . and dispose of, oil . . . from . . . any and all lands, includ-

ing all tidelands, submerged and overflowed lands. . . . Provided . . . that before such power may be exercised as to tidelands, submerged and overflowed lands . . . said Board shall first determine, by resolution, that such lands . . . intended to be so used are not required . . . for the promotion or development of commerce, navigation or fishery. . . . Any and all moneys derived by the City . . . from the development of oil . . . shall be apportioned as follows: . . . The City Treasurer shall . . . at least once each calendar month transfer twenty-five per centum (25%) of all moneys hereafter derived by the City . . . from the development of oil . . . . from beneath the lands constituting the Harbor District . . . which by the provisions of this subdivision are required to be paid into the 'Harbor Revenue Fund,' from said 'Harbor Revenue Fund' to the 'Public Improvement Fund,' which said fund is hereby created and established; provided said transfer shall be made only in the event that such moneys may be used and expended for the purposes hereinafter stated without violating the provisions of grants by which the City acquired title to all tide and submerged lands from the State of California. . . . The moneys . . . in the 'Public Improvement Fund' shall be used exclusively for the payment of costs and expenses for construction, reconstruction, repair and maintenance of public improvements, including the purchase of such land, rights and properties as may be necessary therefor, as shall have been provided for in the official budget of the City. . . ."

As shown above there is nothing in the authorized uses of funds above provided for which is inconsistent with "the trusts upon which said lands are held by the State of California and with the requirements of commerce or navigation at said harbor." It is already established by *City of Long Beach* v. *Marshall* (1938), *supra*, 11 Cal.2d 609, 620, that "the city has the right to drill for and extract the oil from these lands which it owns," and that, as noted above (p. 612, 616), "the mineral rights" as between state and city "are owned by the municipality." Furthermore, the defendant city treasurer is in no position to claim a breach (either actual or potential) of the grant from the state. The state, by approving the charter provisions above quoted, must be understood to have consented to the specified uses of the money provided that such uses would not, even though approved by the state, violate "the provisions of grants by which the City acquired title to

all tide and submerged lands from the State." That the Legislature so qualified its approval of the designated uses of the funds is but consistent with the request of the city and with the terms of the original grant (Stats. 1911, p. 1304), which required that any leasing of the lands be "for purposes consistent with the trusts upon which said lands are held by the *State of California* and with the requirements of commerce or navigation at said harbor." (Italics added.) It appears to me that, subject to those trusts and priorities, the state, by approving the charter provisions above quoted, must be understood to have consented to the allocation and use of the moneys as specified. No other purpose was served by its action, which is not to be deemed meaningless. Having so consented it should not be permitted, in the absence of a showing of actual or potential breach of those conditions, to prevent the use of the moneys for the very purpose authorized. Certainly a Public Resources Code section (§ 6875) adopted in 1941 (based on Stats. of 1938) and quoted in the majority opinion cannot supply an interpretation of a 1946 legislative approval of a city charter amendment—and, surely, in the face of the Marshall and the Stockburger cases, *supra* (11 Cal.2d 609 and 12 Cal.2d 440), the Legislature may not (as seems to be suggested by the opinion of Justice Traynor, it intends to do) "interpret" to itself or its agents the right to drill on Long Beach tidelands. Of course no such attempt appears to have been made by the Legislature; in section 6875 of the Public Resources Code, it is doubtless referring to such tidelands grants as that to Santa Barbara, mentioned at page 618 of the Marshall case, in which the state reserved the mineral rights in the lands. The state cannot and does not here attack the purpose for which the funds are proposed to be used and the defendant city treasurer manifestly is in no better position than the state to resist the city's action.

It is regrettable that the majority opinion by strained legalisms attains the ends of a wastage of public property and the wholly unnecessary imposition of additional taxes upon long suffering taxpayers.

Under the circumstances shown, the plaintiff city is entitled to the writ.

Spence, J., concurred.

Petitioner's application for a rehearing was denied January 26, 1948. Schauer, J., and Spence, J., voted for a rehearing.