[Sac. No. 5133. In Bank.—November 28, 1938.]

PROVIDENT LAND CORPORATION (a Corporation), Appellant, v. I. G. ZUMWALT et al., Respondents.

Louis Bartlett and W. S. McGuire for Appellant.

George R. Freeman, Thomas Rutledge and Elmer Laine for Respondents.

Hankins & Hankins, C. F. Metteer, Harry W. Horton, George R. Kirk, Arvin B. Shaw, Jr., A. L. Cowell and Thomas C. Boone, as *Amici Curiae,* on Behalf of Respondents.

THE COURT.—This is an action by a bondholder to set aside purchases by an irrigation district of its own bonds from other bondholders.

Provident Irrigation District was organized in April, 1918, under the provisions of the California Irrigation District Act (Deering's Gen. Laws, Act 3854, p. 1948), with an area of some 22,805 acres. Two bond issues were sold, one in 1918 and the second in 1921, in the total aggregate sum of $1,190,-000. In common with most of the other irrigation districts, it suffered considerable delinquencies in its assessments in recent years, and much of the land was taken over by the district for nonpayment. For reasons hereinafter mentioned, this did not relieve the district's financial difficulties, and in January, 1936, its outstanding bonds were in the sum of $900,000, with $152,000 in instalments of principal past due. Unpaid interest coupons in the approximate sum of $225,000 were also past due.

From 1933 to 1936 the district acquired title to over 10,000 acres of land by collector's deed after sale for delinquent assessments. Being unable to find a buyer for any of the land, it leased a portion of it during these years, and deposited the proceeds in its general fund. On January 7, 1936, the directors passed a resolution declaring that the sum of $10,-

000 in the general fund constituted a surplus, and ordered that it be set aside for the purchase of bonds of the district in the open market. The secretary was instructed to inform the bondholders that they would be bought from the one making the lowest offer. On February 4, 1936, the district by another resolution purchased from three bondholders, I. G. Zumwalt, defendant herein, the Capital National Bank, and L. M. Benoit, a total of 50 outstanding bonds and attached coupons, of the par value of $1,000 each, for said sum of $10,000.

Plaintiff is the holder of bonds past due in the sum of $86,000 and coupons past due in the sum of $125,000. Its bonds were due and registered prior to those of the aforementioned parties. On the theory that the purchases by the district were in violation of the provisions of the Irrigation District Act, plaintiff sued to set aside the sales and to restore to the treasury of the district the sum of $10,000 paid for the bonds. Three separate actions were brought against each of the three sellers mentioned above, joining as defendants the district and its officers and directors. The complaints in each case are practically the same, and the decision in the instant case will be determinative of the other actions, namely, *Provident Land Corp.* v. *Provident Irr. Dist. et al.,* Sac. No. 5134 (*post,* p. 791 [85 Pac. (2d) 122]), and *Provident Land Corp.* v. *Benoit et al.,* Sac. No. 5135 (*post,* p. 790 [85 Pac. (2d) 122]).

The complaints allege that the resolution setting aside the sum of $10,000 for the purchase of bonds did not specify any time or place, and that no notice of such intended purchase was given. It is further set forth that Benoit, now deceased and represented in the action by his administratrix, was the secretary of the district; and that each of the three purchases was at the identical fixed price of 20 per cent of the par value of the bonds, determined in advance. The complaints do not allege fraud or collusion, nor do they attempt to show that other bonds could have been bought at a lower price. The theory of the actions is simply that the sales were beyond the powers of the district and in violation of the rights of bondholders.

The trial court sustained general demurrers to these complaints, and upon failure to amend, judgment by default

followed, from which plaintiff appealed. The precise question raised by the appeals is whether the purchases were valid, that is, whether the district had power to buy unmatured bonds at a discount with funds derived from rentals of land acquired by sale for delinquent assessments, despite the existence of unpaid bonds and coupons which are prior in registration to those so purchased. There is a broader question, however, which underlies this group of actions and several other cases now pending in this court. That question, stated simply, is whether unpaid bondholders, in the unusual situation where there is wholesale delinquency in assessments, wholesale default in bond payments, and acquisition of substantial portions of the land by the district itself, have any special equitable rights or remedies, in addition to those expressly stated in the statute. These questions will become clearer by a brief review first, of the relevant provisions of the statute, and second, of the economic background of the present controversy.

The basic provision indicating the normal remedy of the bondholders is section 33 of the act, which read prior to 1935: "Said bonds and the interest thereon shall be paid from revenue derived from an annual assessment upon the land within the district; and all the land within the district shall be and remain liable to be assessed for such payments as hereinafter provided." Section 39 provides that the directors shall levy an assessment upon the lands in an amount sufficient to raise the interest and principal coming due on the bonds. The assessment is a lien against the property assessed (sec. 40), and upon delinquency, the property must be sold to the district (sec. 43). It may be redeemed within three years or at any time thereafter before a deed has been delivered. (Sec. 47.) Section 52 provides for payment of matured bonds and interest coupons, and for additional interest of 1 per cent from the time of presentation, if not so paid.

The ordinary method of payment of bondholders is clearly indicated by these provisions. The directors must levy assessments in a sufficient amount to meet principal and interest payments. If delinquency occurs a higher assessment may be levied thereafter to make up the loss, and meanwhile the district may proceed to sell the land of the delinquent owner

and buy it in. If a heavy delinquency occurs, the remaining land bears a correspondingly heavy burden, for every parcel is liable ultimately for the entire bonded indebtedness, and assessments may therefore be ''pyramided'' on the land which is not in default. It would ordinarily follow, however, that the land taken in by the district would be resold, and some money would be realized from the sale; and that thereafter the land thus returned to private ownership and liable again for assessments would prove a sufficient source of revenue to keep the assessments at a reasonable figure.

But economic conditions have prevented the working out of this plan in the contemplated manner. Farmers in the agricultural area embraced by various irrigation districts have found it increasingly difficult to meet the obligations of mortgages, taxes and district assessments. When delinquencies began to mount, it became impossible to stop them because of the fact that the remaining land faced continually rising assessments. Moreover, there were no purchasers for the lands taken in by the districts, because a new landowner would immediately become liable for assessments, which could be pyramided to any extent. As a result, some districts now own practically all the land within their boundaries, which they are unable to sell. The land thus owned is of course not subject to assessments, and therefore produces no revenue in this manner. These districts have long been in default in bond payments.

Having title to this enormous acreage which they are unable to sell, these districts have turned to leasing of the land as a means of raising some revenue. In the case of defendant Provident Irrigation District this was done for several years, and a total income of $57,578.30 was produced for the years 1933, 1934 and 1935. This money was placed in the district's general fund, and it was from this fund that the directors took the sum of $10,000 to buy the 50 bonds from the other defendants in these cases. It thus appears that the land, which is the normal source of the funds with which to meet the obligation of the bonds, is not only not producing funds for that purpose, but is actually being used to produce funds for other purposes. It is not difficult to perceive that if the procedure followed herein is approved, bondholders may be left entirely without a practical remedy to obtain any

payments. It is further apparent that the district's method of buying outstanding unmatured bonds at a discount is in effect the giving of a preference to bondholders who are not legally prior in time to others.

The defendants contend, however, that the directors of the district acted in strict compliance with the statutory requirements, and they point out that the sole remedy of the bondholders under the terms of the act is to compel the levy of assessments, and the enforcement of the same by sale of the land for delinquency. (See *Mulcahy* v. *Baldwin*, 216 Cal. 517, 525, 526 [15 Pac. (2d) 738].) They further contend that lands acquired by the district may properly be used for any of the purposes for which the district was formed, and that the use of the rentals to retire bonds at a discount is a proper use thereof, and within their discretion. It may be observed here that the benefit to the landowners resulting from the retirement of any part of the outstanding indebtedness is largely illusory because of the virtual disappearance of the landowner. The true situation seems to be that the directors of the district, by their present policy, are administering the land for the benefit of lessees who are able to rent the land at exceptionally low prices, and for those particular bondholders whose bonds are purchased and retired. The delinquencies have gone too far in this and other districts to save the landowners.

In so far as the act itself is relied upon as a justification for this use of the district's funds, the strongest argument in favor of defendants is based upon certain amendments passed after the bonds were issued. Section 29 of the act contains the general provision that title to property acquired by the district "shall be held by such district, in trust for, and is hereby dedicated and set apart to the uses and purposes set forth in this act", and the board of directors is empowered to sell or lease the same. Section 47, as amended in 1927, provides that where property is purchased by the district, "such district shall have the same rights thereto, and to the rents, issues and profits thereof, as a private purchaser". Section 52, at the time the bonds were issued, provided that when the *bond fund* contained $10,000 in excess of the amount necessary to pay bonds and interest, the directors could *advertise for sealed offers* to redeem bonds

not yet due, and should accept the lowest offer. As amended in 1931, this section provides that whenever there is "in *any fund* of the district money in excess of that required for the purposes of *such fund*", the directors "may purchase with such surplus money, or any part thereof, any of its bonds not then due". The requirements of notice and acceptance of the lowest sealed offer were eliminated. Section 67, as amended in 1931, reads: "The following funds are hereby created and established, to which the moneys properly belonging shall be apportioned, to wit: bond principal fund, bond interest fund, construction fund, general fund."

The position of defendants is that the district has fulfilled its entire duty to the bondholders by levying assessments and selling the land for delinquency. Thereafter, they contend, the title to the land acquired by the district is held for all of the purposes of the act, and not for the benefit of the bondholders (sec. 29, *supra*) ; that the district has the same rights in these lands as a private purchaser, and may lease them and use the rentals for any of the purposes of the act (sec. 47, *supra*) ; and that consequently, in their discretion, the directors may place these rentals in the general fund, to meet general obligations of operation and maintenance of the district; and thereafter, if there is a surplus in this fund, they may use the same to retire bonds not yet due (sec. 52, *supra*).

Although the question is a difficult one upon which we find no directly controlling authority, we are unable to agree with defendants' position which, as already pointed out, has the effect of giving a preference to bondholders inferior in right, and may result in a complete cessation of any payments to bondholders generally. Defendants place such strong reliance upon the language of amended sections, particularly sections 47 and 52, *supra*, that a problem of constitutionality is suggested by what may appear to be a legislative impairment of substantial rights of bondholders. But upon a careful examination of the act as a whole, we have concluded that the real issue is rather one of interpretation. In our opinion, the statute was intended to secure the bonds by the proceeds of the land in the district. It is true that the bonds themselves are not a lien on the land. But the assessment is a lien (sec. 40), and the district is re-

quired to collect the assessment or sell the land. Land coming into other private ownership is again liable for assessments (sec. 33), and land in possession of the district should, if possible, be sold again, so that it may produce the required revenue. There is nothing in the nature or the terms of the act which sanctions the extraordinary procedure attempted herein, where the holders of matured bonds are unpaid, and the only revenue produced by the land is diverted to a few selected holders of unmatured bonds. ■ It is no answer to say that with legislative aid, the legislation being subsequent to the making of the bondholders' contract, a classification of "funds" has been made, and a method of declaring a "surplus" has been devised, with the effect of destroying the sole intended source of payment of the bonds. We do not understand how a debtor owing $360,000, long overdue, can have a surplus of $10,000. ■ Nor do we understand how the district can be entitled to take all of the money derived from the land, whether by sale or lease, and use it for purposes other than payment of the primary obligations of holders of overdue bonds. It is within the discretion of the directors to use some portion of it for running expenses, and where this use is necessary, their discretion will be upheld on familiar principles. ■ But when the directors themselves declare that a surplus exists, over and above the operating needs of the district, two things should be clear: first, that this money should go to the bondholders; and second, that in any event, it should not be given to junior bondholders in preference to those with prior claims, but should be paid on past due bonds and coupons in the order of their presentation. And to reach this conclusion we need not find any express direction setting forth the exact procedure in the statute. The situation is one not contemplated by the act, not covered by any clear provision, and calls for a construction of its general provisions in the light of equitable principles.

. ■ These principles find an appropriate foundation in section 29 of the act, which provides that property acquired by the district under its provisions shall be held "*in trust for,* and is hereby dedicated and set apart to the *uses and purposes set forth in this act*". This express statement that the lands are impressed with a trust must be kept in mind in consider-

ing the amendment to section 47, purporting to give the district the rights of a private purchaser. Reading the two sections together, the only reasonable interpretation is that the district may freely transfer, lease or otherwise deal with the lands, in so far as its *power* is concerned, but the *lands* remain in trust, and the district exercises its powers, however broad, as a trustee. Once it is made clear that the lands are held in trust, it necessarily follows that their proceeds, whether by sale or lease, are likewise subject to the trust. It would be manifestly absurd to say that although property is held in trust, none of the benefits of the trust accrue to the beneficiaries, and that none of the rents or profits of the trust property need be used in furtherance of the trust purposes. On this point, namely, that the land is trust property, held for the "uses and purposes" of the act, and that the proceeds are stamped with the character of the property from which they flow, the statute, read in the light of elementary principles, leaves no room for debate.

It next becomes necessary to determine whether payment of the bondholders is one of these purposes. On this question defendants and *amici curiae* vigorously contend that the purposes of the act are to construct irrigation works, and provide for irrigation of the lands of the district. They concede that the district is authorized to borrow money for these purposes, but assert that creation of debts is not one of its purposes. They concede that the act requires repayment of the money borrowed, but assert that this is not one of its purposes. This type of argument, however, tends to prove too much, for it is difficult to conceive of the legitimate use of any funds of the district, derived in any manner, for something which is not a purpose of the district. How can the *assessments*, when collected, be paid to bondholders, if payment of their obligations is not a purpose of the act? If the bond fund was not created to carry out a purpose of the act, for what purpose was it created? But laying aside quibbles as to the exact meaning of the phrase "uses and purposes", it seems clear that if the district is to be created and to function on borrowed money, repayment of the money is not a wholly immaterial and foreign objective. Evading creditors is not a contemplated activity of a public district, whose bonds are recognized investments for financial insti-

tutions. Among other purposes of the act, therefore, is the repayment of the bondholders of the district, and it follows that this is one of the purposes for which the trust money is held.

This view is fortified by a consideration of the general plan of the statute, in so far as it provides for the creation of an obligation and a procedure for payment. The land is the ultimate and only source of payment of the bonds. It can never be permanently released from the obligation of the bonds until they are paid. The release from liability for assessments while the district holds title is intended to be temporary only, and the liability for new assessments is again imposed when it goes back into private ownership. Any practice which removes the land from its position as ultimate security for the bonds, or which places its proceeds beyond the reach of the bondholders, destroys that plan and is contrary to the spirit of the act. And the practice employed by the district herein does exactly that. Theoretically and formally, the remedies of the bondholders remain unaltered. Actually, they have been destroyed. Economic conditions have placed the land itself outside of the power of assessment for payment of the bonds. But it is the act of the directors alone which has taken the *proceeds* of the land from the bondholders. This use of funds, contrary to the whole intent of the act, is in our opinion in violation of the trust impressed on the land under section 29. We do not mean to hold, nor is it contended by plaintiff, that the entire proceeds are held in trust for bondholders. Payment of the bonds is but one of the purposes of the trust. The land may also be a source of funds to enable the district to function. It is true that another important method of raising operating funds exists, namely, the charging of tolls for the use of water (secs. 39 and 55 of the act), a practice said to be successfully employed in some districts. Whether any duty exists to levy such tolls so that money from rentals might go in full to the bondholders is not an issue in the instant case. We assume, for the purposes of this case, that the directors, in their discretion, may determine that some of the proceeds of leasing of lands are essential to operation and maintenance, and may use them for these purposes. But any surplus, over

and above operating expenses, remains subject to the trust, and should go to the payment of bondholders.

The foregoing discussion disposes of such cases as *Mulcahy* v. *Baldwin, supra,* wherein the statement is made: "The declared plan of the Irrigation District Act is that the holders of outstanding bonds of the district have the right to enforce their demands solely by an annual assessment on the lands in the district. Such is their contract." And it is further declared that "in law purchasers of those bonds could look only to the statutory right of assessment and enforced payment under that method of raising revenue". These remarks, obviously correct as a definition of the rights of bondholders in situations within the contemplation of the framers of the act, offer no solution for the entirely new problem which confronts us. We held in the Mulcahy case that the bondholder was not entitled to reach certain special funds, not derived from the land itself but from contracts for the sale of power; and we said that he could "enforce" payment under the assessment method. But suppose the assessment method has disappeared as a means of collecting revenue; can the bondholder "enforce" payment? He has a right to enforce making and payment of assessments under one part of the statute, but there are virtually no lands to assess; by reason of acts taken under other provisions of the statute the assessable land has been completely taken from him, and is now beyond the reach of this remedy. In this situation it would be unreasonable to say that the bondholder's only remedy is to have an assessment levied. We must take a practical view of the circumstances, and recognize that where there are no assessable lands, there is no remedy of assessment. The quoted excerpts from *Mulcahy* v. *Baldwin, supra,* are not, therefore, an obstacle to the application of the principles which we have already discussed. If there is any doubt as to the propriety of this interpretation of the holding of that case, it may be set at rest by an examination of our late decision in *Kerr Glass Mfg. Corp.* v. *San Buena Ventura,* 7 Cal. (2d) 701 [62 Pac. (2d) 583], where we recognized the justice of applying equitable principles to the payment of bondholders in unusual circumstances, notwithstanding the fact that express provisions of the statute stood in the way. We call attention to this significant statement on page 710

of that decision: "The trust status of the fund has been considered appropriate where it is theoretically replenishable by a so-called inexhaustible taxing power, but the exercise of that power is rendered fruitless by reason of economic conditions resulting in a tax-collecting incapacity." In the same sense the bond fund in the instant case is theoretically replenishable by the unlimited power of assessment, but in fact that power is gone because the subject of the assessment, the land, is removed from its reach.

It follows that if the allegations of the complaints are true, the purchases of the bonds from the various defendants were unauthorized, and the sales must be set aside, and the consideration returned to the parties.

The judgment is reversed with directions to the trial court to overrule the demurrers and permit defendants to answer if they deem it advisable to do so.

Rehearing denied.