## In re CORCORAN IRR. DIST.
### No. 4815.

District Court, S. D. California, N. D.
May 1, 1939.

Athearn, Chandler & Farmer, of San Francisco, Cal., for Corcoran Irr. Dist.

W. Coburn Cook, of Turlock, Cal., for Messrs. Mason and Newhouse.

Clark, Nichols & Eltse, of Berkeley, Cal., for Mrs. Mary E. Morris.

YANKWICH, District Judge.

Corcoran Irrigation District, to which we shall refer as "the district", is an irrigation district organized in 1918 under the California Irrigation District Act (Stats. Calif. 1897, page 254) for the purpose of constructing, improving, maintaining and operating improvements and projects aimed at the improvement of the lands within its boundaries for agricultural purposes. The district includes 51,000 acres in Kings County, California. After its organization, it issued and sold bonds in the sum of $760,000. The bonds were dated January 1, 1920, and were in the denomination of $1,000 each, bearing interest at the rate of 6 per cent per annum, payable semi-annually on January and July 1 of each year. Interest accruing prior to July, 1923, has been paid. Bonds which matured prior to January 1, 1933, with the exception of three bonds, have been paid. The bonds now outstanding and unpaid are 733 in number, of a total face value of $733,000.

In an amended petition, which seeks the approval of a plan of composition under the provisions of Chapter 9 of the

Bankruptcy Act, of 1938, § 81 et seq., 11 U.S.C.A. § 401 et seq., the district alleges its inability to pay its debts as they mature.

The gist of the plan is set forth in the Resolution of the Board of Directors of the District, authorizing the institution of the proceedings under the Act and dated the 29th day of September, 1937, a portion of which resolution reads:

"The district proposes a composition of its outstanding indebtedness by paying holders thereof in cash the sum of 75 cents for each dollar of the principal amount of their respective claims, provided all unmatured coupons are attached to the bonds and deducting from said amount the sum of 55.75 cents on the dollar for each missing coupon; that 65.791 cents will be paid from the proceeds of a loan by the Reconstruction Finance Corporation and the remaining 9.209 cents from funds which are in the hands of the district raised from other sources.

"To evidence such loan the district further proposes to issue and deliver to the Reconstruction Finance Corporation its new or refunding serial bonds in the principal amount equal to the aggregate amounts disbursed therefrom for the purposes mentioned, including the cost and expenses, not to exceed $484,500.00, incurred by the district in connection with its debt readjustment, together with 4% interest on all such disbursements from the date thereof until the new or refunding bonds evidencing same are issued and delivered to the Reconstruction Finance Corporation.

"The new or refunding serial bonds to be issued and delivered by the district to the Reconstruction Finance Corporation will bear interest from date until paid at the rate of 4% per annum, payable semiannually; the first installment of principal will mature three years after date thereof, and thereafter the remaining installments of principal will mature annually according to a schedule therefor which is acceptable to the Reconstruction Finance Corporation.

"Or, in the alternative, the details of the above plan may be reasonably modified in such particulars as the Court deems just and proper, and as may be acceptable to the Reconstruction Finance Corporation and the president and secretary of the district."

The California District Securities Commission, on May 8, 1936, approved the plan as finally proposed, and also sanctioned the filing of a petition seeking the approval of the plan by this court. The Reconstruction Finance Corporation, an agency of the United States, *as purchaser,* now holds 629 or 92.6 per cent of the outstanding bonds and the interest coupons attached to them. It has accepted the plan and consented to the filing of the petition.

The non-consenting bondholders hold only 54 bonds. Of these, three holding a total of forty-four bonds or six per cent have appeared at the hearing in opposition to the confirmation of the plan.

The history of the district shows a valiant effort to construct an irrigation system on land of little value, to secure water at a price which the farmers could pay and raise crops profitably. That the effort was not successful is shown by the fact that even during the period when the district met its obligations, there was a consistent rise in the cost of maintaining the irrigation works and in obtaining the needed water supply, and a constantly diminishing return to farmers for their product.

It is not necessary to go into great detail. But the facts do show that only about 31,000 acres in the district are possibly arable. The average area cropped during the four years, 1934 to 1937, was only 28,400 acres or 55 per cent of the district. The range of values of the lands is variable. At best, and under most favorable conditions, the average value of the land in the district does not exceed fifty dollars per acre. The directors of the irrigation district, to overcome the scarcity of the water supply, were compelled to acquire, at various times, shares of water stock of a private water company, People's Ditch Company, in order to supplement their direct diversion from Kings River. Even then, the water supply had to be supplemented, by individual farmers, through private pumping plants.

Except in the year 1937, a high flood year, the water available was not sufficient to furnish each acre with one acre foot of water. This to supply a need of 3.5 acre feet per acre for cotton, 4.1 acre feet per acre for alfalfa and one to two acre feet per acre for grain, depending upon the seasonal rain.

The ordinary receipts from assessments and water tolls have not been sufficient, *since 1929,* to pay the operating expenses and the interest coupons due and bonds maturing. The deficit was overcome, between the years 1929-1933, by the issuance

of anticipatory warrants bearing interest at the rate of seven per cent per annum, in the total sum of $86,924.05. Of this amount, $63,097.05 was used for maintenance and $23,827 was used for purchase of water stocks in the People's Ditch Company. To prevent default on bonds, during these years, collections were diverted from the general fund. The warrants were not issued directly to persons who performed services or furnished labor or materials to the district. They were exchanged to banks for money and the money used to pay the district's obligations. Later on, the warrants were gradually paid until none were outstanding in 1937. Despite the depreciation in land values, consequent upon the general depression in agriculture, which began in 1929, the district maintained the assessed valuation and between 1929 and 1933 it increased its tax rate with the following result as to delinquencies:

| | | |
|---|---|---|
| 1930–31: | Tax rate, $3.00 | Delinquencies 21.51 |
| 1931–32: | Tax rate, $2.00 | Delinquencies 32.34 |
| 1932–33: | Tax rate, $2.00 | Delinquencies 40.70 |
| 1933–34, despite a reduction of the tax rate to $1.50, | | |

showed a delinquency of 46.93. The following years the delinquencies decreased. But this corresponds with the period during which the district was placed under the direction of the California Irrigation District Commission (Stats.Calif.1933, Chapter 60, p. 355, § 11), for being in default on its bonds, principal and interest, to the extent of 20 per cent of the amount due, and to the efforts then begun to secure the aid of the Reconstruction Finance Corporation for refinancing and rehabilitation,—efforts which culminated in the present plan of composition.

It is made the duty of this court to confirm the plan if "(1) It is fair, equitable, and for the best interests of the creditors and does not discriminate unfairly in favor of any creditor or class of creditors; (2) complies with the provisions of this chapter; (3) has been accepted and approved as required by the provisions of subdivision (d) of this section; (4) all amounts to be paid by the petitioner for services or expenses incident to the composition have been fully disclosed and are reasonable; (5) the offer of the plan and its acceptance are in good faith; and (6) the petitioner is authorized by law to take all action necessary to be taken by it to carry out the plan." 11 U.S.C.A. § 403(e).

The bankruptcy of the district is disputed. Under the provisions of the Act (11 U.S.C.A. § 403(a), either insolvency or inability to pay its debts as they mature gives us jurisdiction to entertain a plan of composition. And, while insolvency under the general bankruptcy act does not exist, unless the aggregate of the bankrupt's property is, at a fair valuation, insufficient in amount to pay his debts (11 U.S.C.A. § 1, subd. 19), inability to pay one's obligations has a narrower meaning. The very alternation in the definition shows an intent to make the remedy of this chapter available to taxing agencies when they are either insolvent or unable to meet their obligations as they mature. The latter condition may exist although the debtor has an excess of assets over liabilities. And the reverse. See: In re Sparta Canning Company, 7 Cir. 1934, 73 F.2d 732, 736; National Refining Co. v. Penn. Petroleum Co., 8 Cir. 1933, 66 F. 2d 914, 918; In re Utrecht Coal Co., 2 Cir. 1933, 63 F.2d 745. And in the recent extensions of the bankruptcy powers by the Congress, to include reorganizations, even the word insolvency, in so far as it relates to the court's power to approve or disapprove of a plan, is not to be given the meaning which it has under general bankruptcy statutes. Lowden v. Northwestern National. Bank & Trust Co., 1936, 298 U. S. 160, 56 S.Ct. 696, 80 L.Ed. 1114. The same two phrases in the alternative are used in the railroad reorganization provision, Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205. Interpreting them, the Supreme Court has said that they do not necessarily imply bankruptcy as it is understood in the general bankruptcy law. Thus in Continental Illinois Nat. Bank v. Chicago, Rock Island & P. Railway Co., 1935, 294 U.S. 648, 671-682, 55 S.Ct. 595, 604, 79 L.Ed. 1110:

"Section 77 advances another step in the direction of liberalizing the law on the subject of bankruptcies. Railway corporations had been definitely excluded from the operation of the law in 1910 (chapter 412, § 4, 36 Stat. 838, 839, 11 U.S.C.A. § 22), probably because such corporations could not be liquidated. in the ordinary way or by a distribution of assets. A railway is a unit; it can not be divided up and disposed of piecemeal like a stock of goods. It must be sold, if sold at all, as a unit and as a going concern. Its activities cannot be halted because its con-

tinuous, uninterrupted operation is necessary in the public interest; and, for the preservation of that interest, as well as for the protection of the various private interests involved, reorganization was evidently regarded as the most feasible solution whenever the corporation had become 'insolvent or unable to meet its debts as they mature.'

"Equity receiverships, resorted to for that purpose, have never been satisfactory for many reasons. Partly, no doubt, in recognition of that situation, Congress by section 77 added railroad corporations to the category of those who might have relief by legislation passed in virtue of the bankruptcy clause of the Constitution; and determined, after consideration, that such relief to be effectual should take the form of a reorganization, and should extend to cases where the corporation is 'unable to meet its debts as they mature.' The last phrase, since it is used as an alternative for the word 'insolvent,' obviously means something less than a condition of 'bankruptcy' or 'insolvency' as those words are employed in the law. See Bankruptcy Act, § 1, (15), 11 U.S.C.A. § 1 (15), which defines an 'insolvent' as one whose assets, at a fair valuation, are not sufficient to pay his debts. It may be construed to include a debtor who, although unable to pay promptly, may be· able to pay if time to do so be sufficiently extended. Obviously, section 77 does no more than follow the line of historical and progressive development projected by previous acts."

A similar interpretation was placed upon the general corporate reorganization section, 77B, 11 U.S.C.A. § 207. Kuehner v. Irving Trust Co., 1937, 299 U.S. 445, 57 S.Ct. 298, 81 L.Ed. 340; Milwaukee Postal Bldg. Corp. v. McCann, 8 Cir. 1938, 95 F.2d 948; In re Hotel Governor Clinton, 2 Cir. 1938, 96 F.2d 50.

The fact that the district was unable to meet its ordinary operating expenses without resorting to anticipatory warrants, and that only by diverting funds from the general fund did it continue to pay its obligations under the bond issue between 1929 and 1933, is conclusive proof of its precarious financial position. The objectors say that this could have been remedied either by increasing the warrant obligation or by increasing the tolls. It is very easy to rationalize after an event. It is easy to tell persons in charge of a public enterprise who for years have struggled to keep it going, and were unsuccessful even with the aid of the protective laws of a state which, like California, has fostered everything pertaining to irrigation, that they could have raised more money in a certain specific way. But, what is there in the record to show that banks would have taken additional warrants in a sufficient amount to meet the bond obligations as they did to meet current expenses and to enable the directors to increase their water supply through the purchase of water stock? It may be assumed (and the record discloses) that most of the lands are subject to mortgages. It is easily understood why banks, to protect their own debts, and to keep going farmers without whose presence in the community they would not have any clients, might advance money to keep in operation an irrigation district without which all possibility of gain from farming operations would be lost. But it does not necessarily follow that the same banks would have advanced more money to service the bonded indebtedness. The situation is comparable to that of a bank, which, while advancing money to a farmer to allow him to raise crops, might decline to advance him money to pay on his mortgage, owned by some one else.

Ultimately, the question of inability to pay one's debts is not to be determined by flights into the realm of the impossible, but by the realities of a particular situation. And there being no showing that there were sources through which additional warrants could have been floated to pay the bondholders, the presumption arises that, in the opinion of the directors, the borrowing limit from that source had been reached. The fact that the warrants were repaid while the bond issue was in default has little significance. The directors were merely attempting to maintain a source of credit by repayments.

The other suggested source of revenue was the increase of water tolls, *payable in advance of supply,* to cover the amounts due under the bond issue. Here, too, we must avoid replacing reality by fancy. It may be true that the directors could have increased the tolls in sufficient amount to cover the additional money. But there is a limit beyond which the taxing power of a taxing agency cannot go, even in the absence of legal limitations. And that is the ability of the taxpayer or toll payer to

pay. And so, when we find delinquencies amounting to 46.93 per cent in a taxable year, when we find that even now 9.1 per cent of the area of the district has been deeded to the district for delinquent taxes, we must be guided by the determination of its officers, as explained by the secretary of the district at the trial, that, in their opinion, the taxable limit had been reached.

Whenever such a situation exists in a public taxing body, it has reached tax saturation.

As said by District Judge Long, of the Southern District of Florida, in Re City of Fort Lauderdale, D.C. Fla. 1938, 23 F. Supp. 229, 230: "It is, therefore, the opinion of the court that the levy of this amount would be *so exhaustive as to make it impossible to collect any substantial portion of such tax,* either at the time the original petition was filed, or at this time, to pay the matured and maturing debts, and that petitioner is therefore within the meaning of section 83, clause (a), of chapter 10 of the act of Congress relating to bankruptcy, 11 U.S.C.A. § 403(a)." (Italics added)

There is no substance to the contention that the Reconstruction Finance Corporation is not a creditor. The Resolution authorizing the loan of $484,500 for refinancing purposes provides for disbursement of the loan and the retirement of the old bonds, upon payment of 65.791. Disbursement is not to be made until 85 per cent of the securities has been deposited. New bonds are to be issued later in accord with certain standard provisions attached to the Resolution. These, in the main, call for the deposit of the old securities, for disbursements for their purchase, and the payment of four per cent interest by the borrower. The disposition of the balance remaining after the purchase, the payment of the expenses incurred in connection with the loan or the issuance of new bonds, are dealt with specifically, as are also the new bonds to be issued. The latter clause reads, in part: "The loan authorized by the Resolution shall be effected in accordance with the terms and conditions hereof and in a manner satisfactory to the Division Chief and Counsel and unless they shall otherwise direct, disbursements of or from the loan shall be evidenced by 4% bonds duly authorized and issued by the Borrower (hereinafter called 'New Bonds') having a principal amount at least equal to the amount of disbursements to or for the benefit of the Borrower."

The documentary evidence surrounding the transaction is too voluminous to lend itself to a brief summary. It shows clearly that the main object of the undertaking of the Reconstruction Finance Corporation was the retirement of the outstanding bonds, *through their purchase,* with money of the Reconstruction Finance Corporation.

Leaving aside the contingency of a possible new bond issue, the fact remains that, *at the present time,* the Reconstruction Finance Corporation is *the owner of the bonds, through purchase.* It purchased them from persons other than the district and is their owner, irrespective of what may be done with them later on, in the event of a new issue, or the conditions under which it may later surrender them. This matter received very thorough consideration by my colleague, the Honorable Paul J. McCormick, in re Merced Irrigation District, D.C. Cal., 1939, 25 F.Supp. 981, and in re Lindsay-Strathmore Irrigation District, D.C. Cal. 1939, 25 F. Supp. 988. I agree with his conclusion. As Judge McCormick very tersely put it: "No one can read the record of the negotiations between the governmental agency and the insolvent District and its security holders and fail to conclude that the paramount, imperative and essential feature of the contract was the ultimate and not the immediate retirement of the outstanding bonds which the R. F. C. acquired. This was the objective of the deal, and the failure to attain it renders the whole refinancing project that was agreed to, insecure and dubious. To adopt a contrary interpretation of the agreement would defeat the purpose which the parties who made it sought to accomplish." In re Merced Irrigation District, D.C., 25 F. Supp. 984.

A similar conclusion was reached by District Judge Trimble of the Eastern District of Arkansas in re Drainage District No. 7, D.C. Ark. 1938, 25 F.Supp. 372.

The bonds in the hands of the Reconstruction Finance Corporation are outstanding, and that agency is a creditor of the district to the extent of its bond holdings. We are not dealing here with a completed plan of reorganization. In re City of West Palm Beach, 5 Cir., 1938, 96 F. 2d 85. A taxing agency is not to be denied the relief of this act because pre-

liminary arrangements without which the relief could not have been sought, were made long before the institution of proceedings or even at a time when the act was not in existence. And it is to avoid the effect of such contention, especially under the technic developed by the Reconstruction Finance Corporation, that the Bankruptcy Act of 1938 says specifically that the partial completion or execution of any plan of composition by the exchange of new securities for old shall not affect the proceedings under Chapter 9. 11 U.S.C.A. § 403(j).

A study of the entire record and a history of the difficulties of this district leads to the inevitable conclusion of fairness and equitableness of the proposed plan. All bondholders are treated alike. The fact that interest was paid to the Reconstruction Finance Corporation does not militate against the fairness of the plan. The loan could not have been made without interest. And as this was the only manner in which the money for the retirement of the old bonds could be made available, the benefit which accrued justifies a differentiation which does not amount to unfair discrimination. That the bondholders benefitted is evidenced not only by the fact that they are receiving 75 cents on the dollar, but also by the fact that from the moment the negotiations with the Reconstruction Finance Corporation began, the value of the bonds in open market increased materially. The bonds sold from 65 to 43 in 1931, from 38 to 29 in 1932, from 29 to 25 in 1933, from 45½ to 33½ in 1934, from 52½ to 43 in 1935 and from 60 to 54 in 1937.

Ultimately, the question is: Do all the bondholders under this plan receive the same amount? The answer is: All receive 75 per cent and no more. That some, through the payment of coupons which matured or otherwise, may have received additional amounts in the past or during the preliminary stages does not alter the situation. That to insure the bondholders 75 cents on the dollar, the district must pay out of its own funds 9.209 cents on the dollar over and above the amount paid by the Reconstruction Finance Corporation and that the plan is accepted by 92.6 per cent of the bondholders speaks not only of its fairness, but also of the good faith of the directors of the district.

Lands within the district are included in other governmental agencies. But as these agencies are not affected by the plan, the exclusion of these lands does not touch either the validity or the fairness or equitableness of the plan.

The recent decisions of the Supreme Court of California (Moody v. Provident Irrigation District, 1938, 85 P.2d 128; Provident Land Corp. v. Zumwalt, 1938, 85 P.2d 116; El Camino Irrigation District v. El Camino Land Corp., 1938, 85 P.2d 123; Clough v. Compton-Delevan Irrigation District, 1938, 85 P.2d 126; Anderson-Cottonwood Irrigation District v. Klukkert, 1939, 88 P.2d 685) re-emphasizing the governmental nature of California irrigation districts, have not changed the law as I found it to be in Re Lindsay-Strathmore Irrigation District, D.C.Cal. 1937, 21 F.Supp. 129. The decision of the Supreme Court (United States v. Bekins, 1938, 304 U.S. 27, 58 S.Ct. 811, 82 L.Ed. 1137) is proof that the court understood the nature of California irrigation districts and was determined to allow the remedy to apply to them. We cannot read an exception into the law which would, *at this time,* exclude California irrigation districts from the purview of the Act. The matter was before the Supreme Court and the law, as declared by it, must be taken to be the law as applied to irrigation districts of California. These districts existed long before the recent California decisions. These decisions have not changed their nature.

The constitutionality of the Act being beyond question (United States v. Bekins, 1938, 304 U.S. 27, 58 S.Ct. 811, 82 L.Ed. 1137; In re Drainage District No. 7, D.C. Ark. 1938, 21 F.Supp. 798; In re City of Fort Lauderdale, D.C. Fla. 1938, 23 F.Supp. 229) and the reduction of debts being of the essence of the exercise of the power of bankruptcy, there is no violation of due process. U.S.C.A.Const.Amend. 14. Hanover National Bank v. Moyses, 1902, 186 U.S. 181, 22 S.Ct. 857, 46 L.Ed. 1113. We cannot, as urged by counsel for the objectors, consider the reduction in the face value of their security as a deprivation of property affecting the fairness of the plan. If that were true, no plan of composition or reorganization could ever be approved, because all of them deprive, *indirectly,* some creditor of some property right, either by reducing the principal or

interest due him, or by extending the time of maturity of his debt. See Kuehner v. Irving Trust Co., 1936, 299 U.S. 445, 452, 57 S.Ct. 298, 81 L.Ed. 340.

Other points have been considered but require no special comment.

The plan holds out hope to the district. It assures the completion of a canal needed to better serve the district and makes possible continued operations, with solvency. We should, in the interest of sound public welfare, sanction a plan that would make this possible, rather than allow a small minority of dissenting bondholders to wreck the whole structure by insisting upon full payment of their debt.

On the whole, I find that the plan of the Corcoran Irrigation District for the composition of its debts under Chapter 9 of the Bankruptcy Act as set forth in its petition and amended petition on file here, and as disclosed by the hearing in open court, is fair, equitable and for the best interest of creditors and does not discriminate unfairly in favor of any creditor or class of creditors; that it was made in good faith and is, in all other respects, legal.

The plan is hereby confirmed.

Findings and interlocutory decree confirming the plan to be prepared by the petitioner, under Local Rule Eight.