## TEXAS AGRICULTURAL ASS'N OF EDINBURG et al. v. HIDALGO COUNTY WATER CONTROL & IMPROVEMENT DIST. NO. 1 et al.

### No. 83.

District Court, S. D. Texas, Brownsville Division.

Sept. 10, 1940.

On Motion for New Trial Oct. 31, 1940.

Paul G. Greenwood, of Harlingen, Tex., for plaintiffs.

Albert G. Haigh, of Edinburg, Tex., for defendant Water Control & Improvement Dist.

Strickland, Ewers & Wilkins, of Mission, Tex., for defendants Abraham Estate and others.

ALLRED, District Judge.

Plaintiff is an association composed of resident taxpaying property owners in the Brownsville Division of this court.

Defendant Hidalgo County Water Control & Improvement District No. 1 is a public corporation organized under Section 59, Article XVI of the Texas Constitution, Vernon's Ann.St., and Title 128 of the Texas Statutes, Vernon's Ann.Civ.St.

Defendants Louis, Herbert, Jack and Fannie Abraham are trustees of the Joe Abraham estate, with Louis Abraham as the managing trustee. All are resident citizens of Oklahoma and will be referred to as "the Abrahams."

Plaintiffs brought this suit to cancel a promissory note executed by the District payable to the trustees of the Abraham estate. Answering, the District adopted plaintiffs' contentions and, likewise, sued to cancel the note. Accordingly, the court heretofore rearranged the parties, and held that diversity of citizenship existed.

In 1923 the Hidalgo County Water Improvement District No. 4, after being duly authorized by a vote of the people, legally issued improvement bonds totalling $1,500,000, each in the sum of $1,000, payable to bearer serially over a period of forty years. In 1929 Hidalgo County Water Improvement District No. 4 was lawfully converted into Hidalgo County Water Control & Improvement District No. 1, the latter assuming the obligations of the former, including the principal and interest due upon the bonds issued in 1923.

In 1934 the District, having become insolvent and owing debts totalling over $2,000,000, applied to the Reconstruction Finance Corporation for a loan to reduce and refinance its indebtedness upon a basis of 45.895 per cent. A loan, not to exceed $902,300 was authorized by R. F. C. and acceptances secured from holders of more than 90 per cent of the bonds and obligations of the District.

The Abrahams, however, did not accept. The estate held $32,000 of such bonds, together with interest coupons thereon, representing a total indebtedness of $43,742.13. The principal on the Abrahams' bonds was due in 1941, '42, '43, '44, '45, '46 and '47. Interest, however, was payable on each bond semi-annually at 6 per cent; and the greater portion of the interest coupons were delinquent since 1932. The Abrahams were threatening suit upon such of the coupons as were past due.

On March 12, 1937, the estate and the District entered into a written contract to refinance such bonds whereby the District was given an option to purchase same on or before June 1, 1937, upon payment of the sum of $14,686.40 in cash and the delivery to the estate of the District's refunding bonds in the sum of $23,245.38. The agreement of March 12, 1937, recited that the parties understood that the District was at that time refinancing its obligations through R. F. C.; and that it would be necessary for the estate to transfer the bonds to R. F. C.; and that the cash to be paid the estate would be advanced by R. F. C. The original agreement between the District and R. F. C. contained statutory covenants that the District would not issue any other bonds having security similar to that of the old ones without the consent of R. F. C.

Thereafter on July 30, 1937, the District and the trustees of the estate entered into a *new* agreement, which superseded the old, and was placed in escrow in the City State Bank and Trust Co. of McAllen, Texas. Under the new agreement the original bonds belonging to the estate were placed in the McAllen bank with instructions that on or before August 15, 1937, such bank would either return the original bonds to the estate or pay to its trustees the same sum of money, $14,686.40, in cash and deliver to the estate a promissory note executed by the District in the sum of $21,048.82, bearing interest at the rate of 4 per cent, payable annually, and due two years after August 5, 1937.

The second contract provides in part:

"The trustees of the Joe Abraham estate will *deliver* said 32 bonds *to* Hidalgo Co. Water Control and Improvement Dist. No. 1 *through* the City State Bank and Trust Company in McAllen, Texas, depositing said bonds in the City State Bank and Trust Company in McAllen, Texas, on this day, with a copy of this contract, with the understanding that on or before the 15th of August, 1937, said bank will either return to the trustees of the Joe Abraham estate said bonds or pay to the said trustees * * * the sum of $14,686.40 in cash and the note of the Hidalgo Co. Water Control and Improvement District No. 1 as hereinafter set out. * * *" (Italics supplied).

The escrow agreement is silent as to what the bank should do with the old bonds and coupons if and when the cash was paid and the note delivered to the estate; but the contract gave the District the right to "settle and refund said indebtedness" by the specified cash payment and delivery of the note; and since the escrow agreement provided that the estate would "deliver said 32 bonds *to*" the District "*through*" the bank, presumably the bonds were to be turned over to the District by the bank.

The principal differences between the contracts of March 12, 1937, and July 30,

1937, were these: Under the first contract, specific reference was made to the R. F. C. arrangement, the difference was to be paid to the estate by the issuance of refunding bonds and the original bonds were to be forwarded by the McAllen bank to the Federal Reserve bank of Dallas, with draft attached and drawn upon R. F. C. for the cash payment; whereas, under the second contract, all reference to R. F. C. was omitted, no provision was made for sending the original bonds and coupons to the Federal Reserve Bank and the difference was to be paid to the estate by the execution of the note instead of refunding bonds.

Both contracts, as well as the promissory note, were duly authorized by resolutions of the District's Board of Directors. No election, however, was held authorizing the incurring of the debt represented by the note, if such debt was required under the Texas Constitution, Art. XVI, Sec. 59(c), to be so authorized. The District has neither made nor attempted to make any special levy for the payment of the note; and has made no payment on either the principal or interest of the note.

On August 5, 1937, the escrow bank at McAllen (at the request of some of the District's directors) sent the original bonds belonging to the estate to the Federal Reserve Bank in Dallas, authorizing the delivery of such bonds to R. F. C. upon payment of the sum of $14,686.40. In transmitting the bonds, the McAllen bank sent to the Federal Reserve Bank a memorandum of sale and receipt, signed by the bank, unconditionally selling the bonds to R. F. C. for $14,686.40 and reciting that the securities and coupons had been deposited with the bank, "pursuant to executed powers of attorney and other documents in the form of those hereto attached which do not contain any qualifications as to ownership or limitations on the power of the depositors to deposit and sell the same for the purpose herein mentioned." At the time of this transaction the manager and secretary of the District was present with the officers of the bank. The bonds had not in fact been deposited by the bank pursuant to any powers of attorney as stated in the memorandum of sale and receipt.

On the same date, August 5, 1937, the secretary of the District's Board of Directors signed an authentication certificate attesting to the validity of the $32,000 original bonds. This authentication certificate was sent with the bonds to the Federal Reserve Bank at Dallas.

After payment of the draft by R. F. C., the Federal Reserve Bank delivered to R. F. C. the original bonds and remitted the cash payment ($14,686.40) to the McAllen bank, which turned same over to the Abraham estate together with the promissory note referred to.

The escrow bank had not been authorized by the Abrahams to consummate the transaction in this manner. Upon the advice of their attorneys, the Abrahams expressly refused to provide, in the second contract, for the delivery of such bonds to R. F. C. The only instructions for authorization the McAllen bank had from the Abrahams was to dispose of the bonds as provided in the escrow agreement.

The original agreement between the District and R. F. C. was in the usual form and provided, among other things:

"* * * Until such old securities have been exchanged for new bonds, all such securities as well as all rights in or to the same, shall continue to be and constitute obligations of the Borrower for the full amount thereof, and nothing in this resolution shall be deemed to limit the right of this Corporation to enforce or cause to be enforced full payment of the principal and interest of such Old Securities * * *

"During the time any of the Old Securities are held by or on behalf of this Corporation, the Borrower will annually levy and collect taxes, assessments or other charges * * * sufficient to pay the principal and interest upon the Old Securities according to their tenor and effect * * *".

R. F. C. did not know of the arrangement between the District's directors and the defendants; and did not know of the execution of the promissory note in question. The bonds are now and have, since August, 1937, been in the possession of R. F. C. Refunding bonds have never been substituted for any of the District's obligations; and the entire original issue of unpaid bonds, together with most of the interest coupons thereon, are still outstanding and unpaid, practically all of them in the hands of R. F. C.

Plaintiffs, as taxpayers, and defendant District ask that the note executed in favor of the Abrahams be cancelled principally upon the ground that it created an indebted-

ness against the District without a vote of the people as required by Art. XVI, Sec. 59 (c), of the Texas Constitution; and upon the further ground that the note is void because the entire transaction was in violation of 15 U.S.C.A. § 616(a), and 43 U.S. C.A. § 403 (3).

The defendants Abrahams contend that the note did not create a new indebtedness but was simply an acknowledgment and refunding of an existing indebtedness; that when the District refinanced through R. F. C. it actually reduced its indebtedness to 45.895 per cent; and that, therefore, the note did not create such an indebtedness as to require a vote of the people.

The Abrahams, reconvening against the District, ask judgment upon their note, and for a writ of mandamus to compel payment; and, in the alternative, they say that if the note should be cancelled by the court, then they are entitled to be restored to their original position and have judgment for the full amount of the original bonds and interest coupons less the cash received, $14,686.40.

■ If the note in question created an "indebtedness," it is void and should be cancelled. Art. XVI, Sec. 59(c), Texas Constitution; Title 128, Art. 7466 et seq., Revised Statutes of Texas, Vernon's Ann. Civ.St. Art. 7466 et seq.; Brown County Water Improvement Dist. No. 1 v. Austin Mill & Grain Co., Tex.Sup., 138 S.W.2d 523; Cameron County Water Improvement District No. 8 v. De La Vergne Engine Co., 5 Cir., 93 F.2d 373. The only difficulty, therefore, is whether, upon the facts, the note in question created a new debt.

■ Counsel for the plaintiffs and the District argue that because the original bonds are in the hands of R. F. C. as collateral for the loan and refinancing, the District is still liable for the entire amount. Technically this may be true, but as a practical matter and in fact the District will never be held for payment of more than 45.895 per cent which was advanced by R. F. C. While, under the statute, R. F. C. has the right to be considered as a creditor for the whole amount *for voting purposes* (Luehrmann v. Drainage Dist. No. 7, 8 Cir., 104 F.2d 696; In re Corcoran Irrigation Dist., D.C., 27 F.Supp. 322; In re Merced Irrigation Dist., D.C., 25 F.Supp. 981; In re Lindsay-Strathmore Irrigation Dist., D. C., 25 F.Supp. 988), yet a construction of the contract with R. F. C. as a whole clearly shows that the District's indebtedness is not the amount of the original old securities, but only in the amount of the disbursements actually made by R. F. C. under its loan.

The contract between the District and the Abrahams did not create a new debt but merely provided for the payment of an old one. Actually the transaction operated to reduce the District's indebtedness by 20 per cent and the rate of interest by 2 per cent. It was for the benefit of the taxpayers of the District and not to add to their burdens by placing a new debt upon their lands.

The situation here presented should be governed by the principles announced by the Texas Court of Civil Appeals at San Antonio in Nueces County Fresh Water Supply District No. 1 v. Texas Bank & Trust Co., Tex.Civ.App., 67 S.W.2d 427; see, also, Hidalgo County Drainage District No. 1 v. Creath, 5 Cir., 68 F.2d 119.

■ Of course the transaction in question was not a statutory refunding as generally contemplated by Texas laws (Art. 7880—92, Vernon's Civil Statutes of the State of Texas, providing for the issuance of new bonds and cancellation of the old bonds by the State Comptroller and registration of new bonds); however, under an act of the Texas Legislature in 1934 (Acts 1934, 43rd Leg., 2 C.S. p. 10, ch. 4, now Art. 7880—147u, Sec. 4), authorizing water control improvement districts of this type to borrow money from government agencies, broad powers are given for the making of refunding contracts with the holders of bonded indebtedness. True, the statute seems to contemplate the issuance of refunding bonds for the whole of such indebtedness and expressly authorizes an "agreement with said district under the terms of which all or part of the uncollected taxes theretofore levied by said district for the payment of all or part of the outstanding bonded indebtedness of said district shall, when collected, be paid into a special interest and sinking fund created for the sole purpose of paying interest on and principal of the bonds held by such holder." There is nothing in this statute to indicate that the bonds to be paid in that manner should not be represented in some other form of indebtedness; and it is also significant that the note sued upon by the District contains a special provision giving the holder of the note all rights "in

and to all delinquent taxes due the interest and sinking fund created to secure this note" which they would have had if they were still the owners of the bonds and coupons.

■ There is no merit in the suggestion that the note is void as being in violation of 15 U.S.C.A. § 616(a), and 43 U.S.C.A. § 403(3).

Counsel for plaintiffs and the District argue that the circumstances indicate that the Abrahams knew that the District had no source other than R. F. C. from which to get the cash payment, and that they knew, or should have known, that the District's officers and the bank would violate the written instructions and send the bonds to R. F. C. These circumstances are overcome, in my opinion, because of the steadfast refusal of the Abrahams to permit the second contract to make provision for such a course of action and because of the stipulations made by counsel that the *only* instruction and authority the bank had was to dispose of the bonds in exactly the manner provided in the escrow agreement.

Decree will be for the Abrahams as cross-plaintiffs for the amount of the note plus accrued interest, together with a writ of mandamus ordering the District to pay same out of such funds as they now have on hand, or so much thereof as is available at the present time, not already pledged, and calling for the application of such funds as may be collected from delinquent taxes not already pledged, and to levy a tax sufficient to discharge the remainder thereof.

In the alternative, if the court should be incorrect in this holding, I am of the opinion that the Abrahams are entitled to recover for the difference between the cash payment and the face value of their bonds and coupons, subject, of course, to the right of R. F. C. to be paid first.

Counsel may prepare and tender to the court suggested findings of fact and conclusions of law upon all points covered in this memorandum as well as any other feature of the case upon which they desire such findings of fact and conclusions of law.

Let a decree be prepared in accordance with this memorandum.

### On Motion for New Trial.

Plaintiffs and the defendant Hidalgo County Water Control & Improvement District No. 1 have filed a motion for new trial herein based upon a number of grounds. There are one or two matters set up in the motion which are misleading, and necessarily were not disposed of in the former memorandum, and findings of fact and conclusions of law.

■ 1. Under paragraph 11 of such motion plaintiffs and the named defendant say that this court erred in entering any decree or order in connection with the case except to determine the substantive rights of the parties and certify the same to the bankruptcy court, to be disposed of in No. 757 in bankruptcy in this division.

In order that the record may be entirely clear, the following statement is made:

The present cause was tried before the court and submitted upon briefs early in June of 1940. While the same was under submission, and in the latter part of June, 1940, the attorney representing plaintiffs in this cause presented a petition for composition of indebtedness in behalf of the defendant district. The application expressly asked that the bankruptcy court except from its stay order this very suit in order that it might be prosecuted to conclusion. The order approving the district's petition as properly filed and calling for a stay of all judicial proceedings expressly excepted this suit; and, as pointed out, such order was issued upon the express request of the district, acting through plaintiffs' attorney.

In view of the situation that has developed, I am of the opinion that the defendant Abraham Estate, if its relief is to be effective, must have a remedy provided in the judgment; but that the district can be completely and amply protected by a stay pending an appeal of this cause. In the order overruling the motion for new trial, I have, therefore, entered such stay and provided that no mandamus, execution or any other writ of process seeking to execute upon or enforce this judgment shall issue pending the appeal. It hardly becomes plaintiffs to now complain of the court's proceeding with this cause when such action was taken upon their request.

■ 2. Under paragraph 64 of the motion for new trial it is claimed that the court "erred in permitting the witness J. E. Wilkins, attorney for the Abraham Estate, after he had excused Judge J. F. Carl, to go on the stand and attempt to

320

contradict the testimony of J. F. Carl, when the said Wilkins was not sworn as a witness when the other witnesses were sworn, and the plaintiff and the district had no notice that he'would appear as such witness."

From this averment it might be inferred that the attorney presenting the motion intended that the witness J. E. Wilkins was not sworn at all. As a matter of fact, he was sworn.

Plaintiffs' witness J. F. Carl was excused either at the request of plaintiffs' attorney, or without· objection; and even after the witness Wilkins had testified, no request was made that the witness Carl be recalled. He lived in the division, not far from Brownsville where the trial was had.

3. In paragraph 59 plaintiffs' attorney quotes a part of the Q and A in which it is made to appear/that the court made a holding directly in conflict with one of the findings of fact and conclusions of law filed by the court. An examination of the record as a whole does not justify the claim made by plaintiffs' attorney as to what the court held at that time.

A careful examination of the record discloses the same defect in regard to a number of other averments made in the motion for new trial.

I have accordingly today entered an order overruling the motion for new trial, but staying execution pending appeal.